# CHARLESTON.

CARNEY *et al. v.* KAIN *et al.*

Submitted June 24, 1895—Decided November 9, 1895.

1. CONSTRUCTION OF WILLS.

   For the will here in question, see *Whelan* v. *Reilly*, 3 W. Va. 597, and *Whelan* v. *Reilly*, 5 W. Va. 356.

2. CONSTRUCTION OF TRUSTS—ESTATE OF TRUSTEES.

   The estate taken by the trustees is commensurate with the powers conferred and duties imposed for the purpose intended to be accomplished. In this case the property was given to the trustees in fee simple absolute and in absolute ownership, and such an estate was required.

3. CONSTRUCTION OF TRUSTS—CONTINUING TRUST.

   Where the trustees are invested with the legal title not as a dry, passive trust, but with active continuing duties to perform, it is called an active continuing trust. Such was the trust in this case.

4. CONSTRUCTION OF TRUSTS—INTENTION OF TESTATOR—CONTINUING TRUST.

   In such case the court, when called upon by the *cestuis que trustent* to close the trust and cause the property to be conveyed or turned over to them, ought to refuse to grant such request where it was the intention of the creator of the trust that the control and management of the property should be in the hands of the trustees, and subject to their discretion, or where the ultimate purposes of the trust have not yet been accomplished. For both reasons such relief was properly refused in this case.

5. CONSTRUCTION OF TRUSTS—POWER OF APPOINTMENT—DISCRETION OF TRUSTEES.

   Where there is a power of appointment of a certain fund in the trustees to and among certain specified beneficiaries, subject to the unlimited and uncontrolled judgment and discretion of the trustees, such discretion is not to be interfered with in the absence of bad faith. In this case there was such power of appointment; and bad faith is not charged nor shown, but a faithful discharge of duty is alleged and affirmatively appears.

6. CONSTRUCTION OF TRUSTS—ESTATE UNDER POWER OF APPOINTMENT—EXECUTORY INTERESTS.

   The estate which passes under such power of appointment comes not from the trustees, but through them from the donor, and does not, of itself, directly create any contingency in contemplation of

law, though it may naturally render the vesting of the executory interest created by executory devise more doubtful. In this case such power of appointment has no bearing in determining the quality of the executory interests created and declared.

7. CONSTRUCTION OF TRUSTS—MONEY—LANDS.

When money is directed or agreed to be turned into land, or land agreed or directed to be turned into money, equity will treat that which is agreed to be or ought to be done as done already, and impress upon the property, as to its being real or personal, that species of character for the purpose of devolution and of title into which it is bound ultimately to be converted. In this case the property was a residuary fund, comprising both real and personal property, and, although the trustees had full power to sell and convert the land into money, they were not expressly directed to do so, and such conversion was not necessary to accomplish the purposes of the trust.

8. CONSTRUCTION OF TRUSTS—CONTINGENT EXECUTORY INTERESTS—EXECUTORY DEVISE AND BEQUESTS.

By the fourteenth clause of this will the testator created and declared in favor of the unborn beneficiaries designated, and to take effect in the event prescribed, certain contingent executory interests in such residuary fund in trust, by executory devise and bequest in fee simple and in absolute ownership.

9. CONSTRUCTION OF TRUSTS—FREEHOLD IN ABEYANCE—FREEHOLD TO COMMENCE IN FUTURE—REMOTE INTERESTS.

To such interests created by executory devise the common-law against putting the freehold in abeyance, and the common-law rule against creating freehold estates to commence in future, can not apply, (1) because it is conveyed in trust, (2) because it is created by executory devise, and (3) because the common-law rules are changed by statute. But they are subject to the rule against remoteness. That they do not contravene such rule is *res adjudicata.* See *Whelan* v. *Reilly* (1869) 3 W. Va. 597—a suit about the same will, between the same parties, or their privies in right or in representation.)

10. CONSTRUCTION OF TRUSTS—EXECUTORY INTERESTS.

Such equitable executory interest remains, with the legal estate, vested in the trustees until the time for it to vest in right or in enjoyment comes, when it springs up as an original whole of its own inherent strength, and vests in the one who may then be ascertained to have a right fixed in interest or in possession.

11. CONSTRUCTION OF TRUSTS—TIME OF CONSTRUCTION OF WILLS.

The will is to be construed as of the time when, ceasing to be ambulatory, it has become fixed by the death of the testator, and not in the light of subsequent events.

12. CONSTRUCTION OF TRUSTS—UNBORN DEVISEE—CONTINGENT ESTATE.

The estate of such unborn devisee is contingent, and can not, in the nature of things, become a vested, equitable estate until he comes into being.

13. CONSTRUCTION OF TRUSTS—EQUITABLE ESTATE—UNBORN DEVISEE.

For some purposes in contemplation of law the equitable estate is treated and considered as though the unborn devisee would probably come into existence.

14. CONSTRUCTION OF TRUSTS—EQUITABLE ESTATE—POSSIBILITY OF ISSUE.

It can not be said that such interest comprised in such bequest or devise has failed until it has become incapable of taking effect by the termination of the time or event prescribed. The possibility of issue is, in contemplation of law, only extinguished with life.

15. CONSTRUCTION OF TRUSTS—PARTIAL INTESTACY.

Therefore there can be no partial intestacy, for the will is valid, and the testator disposed absolutely, but contingently, of the whole residuary fund.

16. CONSTRUCTION OF TRUSTS—PRESUMPTION AS TO INTESTACY.

And the law presumes that the testator did not mean to die intestate as to any part of his property, unless such intent clearly appear.

17. CONSTRUCTION OF TRUSTS—UNBORN DEVISEE—CONTINGENCY.

For the contingency that the unborn devisee will not come into existence the testator did not provide, but left such contingency to be met and provided for by law.

18. CONSTRUCTION OF TRUSTS—EQUITABLE EXECUTORY INTERESTS.

If such contingency shall happen, then such equitable executory interest will spring up in its integrity and vest in possession, in present right of enjoyment in those who are then the heirs at law and personal representatives of the testator, who will take by descent and representation, and not by purchase.

19. CONSTRUCTION OF TRUSTS—POSSIBILITY OF RESULTING TRUST.

At the death of the testator, his then heirs at law. *etc.*, had the possibility of a resulting trust, contingent and dependent upon the unborn devisee not coming into being; somewhat in analogy to the possibility of reverter at law.

20. CONSTRUCTION OF TRUSTS—POSSIBILITY OF RESULTING TRUST —EXECUTORY INTEREST.

Such possibility of resulting trust was coupled with an interest. It was not vested, but the ones who would have taken if such contingency of the executory interest being incapable of taking effect should happen compose the class, and such class which would then take was ascertained, though it was liable to open.

21. CONSTRUCTION OF TRUSTS—POSSIBILITY OF RESULTING TRUST
—STATUTE OF DESCENT AND DISTRIBUTION—STATUTE OF
WILLS—ALIENATION *Inter Vivos.*

Such possibility of a resulting trust to such heirs at law, *etc.*,
was transmissible under the statute of descent and distribution,
and therefore by devise and bequest under the statute of wills;
also by alienation *inter vivos*

22. A case in which these principles are discussed and applied.

HENRY M. RUSSELL for appellants, plaintiffs below, sub-
mitted the following brief:*

This suit is entirely amicable in its character. It relates
to the disposition of a fund held by the principal defend-
ants as trustees. These trustees are entirely willing that
the fund may be disposed of in accordance with the prayer of
the bill, provided only they can feel sure that a decree mak-
ing that disposition of the fund will protect them from the
possible claims of persons who may, at the death of Mrs.
Carney, assert an interest in the fund as having come to them
by the intervening death of some of the present claimants.

In the court below it was argued on behalf of the trustees
that they should be protected by an authoritative decision
of this Court which would not only determine the rights of
the parties to this suit, but which would be a binding enun-
ciation of the law of the state with reference to future con-
troversies between other parties. It was therefore sug-
gested, as a reason why the Circuit Court should refuse the
relief prayed for, that a decree by the Circuit Court for the
plaintiffs, which might happen to be affirmed by this Court
because the judges of this Court might divide equally upon
the questions presented, and would consequently not settle
the law, would not afford the desired protection. This ar-
gument, one of the strongest which was presented by the
trustees to the Circuit Court, can of course have no weight
here.

Philip Reilly by his will appointed trustees, of whom the
present trustees are the successors. By various clauses of
his will he constituted a residuary fund, consisting of real
and personal property, and constituting the residue of his
estate, by the second clause of the will he devised and be-

*Briefs of Counsel given in full by direction of Court.

queathed to the trustees. In this second clause the measure of the estate given the trustees was not expressed, but the language used was broad enough to create a fee. By the ninth clause the trustees were directed to convert the estate into money, so that the testator expected the fund to consist of personal property, though in fact the trustees still hold a part of it as real estate. The fourteenth paragraph of the will is as follows:

"Fourteenthly. After the death of the last survivor of my three children, William, Philip and Mary Jane, the said residuary fund shall be held in trust for the children and other descendants then living of my said three last named children, or such of them as may have a descendant then living, and all such descendants shall have equal shares as among themselves without regard to any differences in degrees of relationship or descent."

William died during the lifetime of the testator. Philip and Mary Jane survived the testator, Mary Jane being one of the present plaintiffs and appellants. Philip died unmarried and intestate.

At the testator's death his only heirs at law were Philip and Mary Jane, a son and daughter, and John, another son, who has since died intestate. It does not appear, and is unimportant, whether John or Philip, the son of the testator, died first. At Philip's death his heirs at law were Mary Jane and John, or John's children. At John's death he left surviving his children, who with Mary Jane are the present plaintiffs and appellants.

The testator having died leaving no widow, it will be seen from this statement of the facts that the present plaintiffs represent together the interests and are vested with the estates, whatever they may be, of all persons who were the heirs of the testator at any time since his decease. If the period of the testator's death is to be looked to, the present plaintiffs represent the interests of Mary Jane and the two surviving sons, and so if the present period is to be looked to only.

The trustees say that the persons who happen to be the heirs at law of the testator when Mary Jane shall have died,

determining those persons as though the testator had died coincidently with Mary Jane, will be entitled to the fund. The trustees insist, therefore, that, as it can not be told now who these persons will be, a distribution of the fund can not safely be made. They say that one of the present plaintiffs, a child of John and a grandchild of the testator, may die leaving children who will survive Mary Jane, and in that case that these children would be entitled to the fund directly, and not through their immediate parent. The plaintiffs claim, on the other hand, that immediately on the death of the testator, an estate in the fund vested in the testator's heirs, that is, in those persons who were the testator's heirs at his death, though their estate was liable to be defeated by the death of Philip and Mary Jane leaving the descendants of either surviving them, and that this estate has passed by regular course of inheritance until it now resides, as a vested estate, in Mary Jane Carney and those of the other plaintiffs who are children of John Reilly.

The controversy presents the same question which would be presented if Mary Jane were dead, and if one of John's children were dead leaving descendants, and a share of the fund were claimed by the administrator of this deceased child of John, on the one hand, and by John's descendants, claiming immediately from the testator, on the other hand. Or, the same question is presented as though the trustees had paid a share of the fund to one of John's children, and he had afterwards died leaving children, who were again claiming this share from the trustees.

It is conceded in the case that there is no possisbility that Mary Jane will have children, and therefore it is certain that the contingency will never occur on which the fund, under the fourteenth clause of the will, was to go to the descendants of William, Philip and Mary Jane. While the death of Mary Jane has not yet occurred, it is entirely proper, if there is a vested estate in the present claimants, to direct a distribution of the fund without waiting until Mary Jane's death. If the present claimants have a vested estate in the fund, so that it must go eventually on the failure of the contingency to the present claimants or to those who shall then represent

them and who will take because they represent them, they should be permitted to enjoy the estate at once, since it has become apparent that the contingency which was to defeat them can never happen. The chancellor acted upon this principle in the case of *McComb* v. *Miller*, 9 Paige 265. In the more recent case of *Male* v. *Williams*, 48 N. J. Eq. 33, a legacy had been left by will to the children of a woman yet unmarried, with a provision that if she should die leaving no children the legacy was to go to others, who were named. She afterwards married and had children, and these children claimed that the legacy should be paid to them, although their mother was still living. It appeared that the mother was sixty eight years of age and had been a widow for a number of years, and that there was no possibility, according to the ordinary laws of nature, that she would ever have any other children. The court held that the children took vested interests in the legacy at birth, subject to open and let in other children who might afterwards be born, but that under the circumstances above referred to there was no reason why the children's enjoyment of the legacy should be postponed until the mother's death, and therefore directed payment accordingly.

I do not understand, however, that the trustees in the case at bar insist upon any objection growing out of the possibility of Mary Jane's having children or leaving descendants. The controversy turns upon the question whether the plaintiffs have vested interests in the fund, or merely contingent interests dependent, as to John's children, upon their surviving Mary Jane.

I.— *The estate in the trustees.*

It was argued in the lower court that the will gave the trustee a fee simple estate in the fund; that it was impossible after the entire fee had been thus given that any estate should remain or be left in the testator's heirs. The conclusion was then drawn that the plaintiffs had no vested estate, but that, upon the death of Mary Jane, a new estate would arise in the persons who might then be properly described as the heirs of the testator. We might concede in the fullest manner that the trustees took an estate in fee

simple in the fund, and yet the conclusion sought to be deduced would by no means follow. As will be more particularly insisted upon in discussing another branch of the case, it is not important whether the plaintiffs have a vested interest in the legal, or only in the equitable or beneficial estate in the fund. If they have a vested equitable estate, the trustees, though holding the legal fee, hold it only as a dry trust for the benefit of the appellants, the equitable owners, and the propriety of distributing the fund at present would be equally manifest.

But the estate of the trustees is not to be measured by the language used in devising or conveying to them, but by the purposes for which the trust is constituted. No matter how broad may be the description of the estate given, yet, if the trust created is to be only for a limited period, the estate of the trustees will be limited to the same period and will cease when that period shall have expired. The leading case of *Doe* v. *Considine*, 6 Wall. 458, fully illustrates this principle. In that case the devise was in the technical language appropriate to convey a fee, being to the trustees and to their heirs. The trust was to a son for life and, upon the decease of the son, then to the child or children of the son, and their heirs forever. The controversy was between the heirs of a deceased daughter of the son, on the one hand, and the trustees or their heirs on the other. The court held that, upon the birth of the son's daughter, a fee vested in her; that it was not important to determine whether this fee was legal or equitable in its character, for if it was equitable the same rules would apply to it as though it were a legal estate. But the court says: "When a trust has been created, it is to be held large enough to enable the trustee to accomplish the objects of its creation. If a fee simple estate be necessary, it will be held to exist though no words of limitation be found in the instrument by which the title was passed to the trustees, and the estate created. On the other hand, it is equally well settled that where no intention to the contrary appears, the language used in creating the estate will be limited and restrained to the purposes of its creation. And when they are satisfied, the estate of the

trustee ceases to exist, and his title becomes extinct. The extent and duration of the estate are measured by the objects of its creation."

It was urged, however, in the court below that the trustees were given power to sell the property which was devised to them, and to sell in fee simple. From this it was argued that a fee was given them by the devise, because it would be unreasonable to suppose that those who were to convey in fee were to take any less estate. A number of authorities were cited in which it was held that where the estate of the trustees was not described in the devise the direction to them to sell would imply a fee. We have no quarrel with these cases, which involved merely the question what estate, under such circumstances, would pass by the deed of the trustees. Unquestionably the trustees under the present will could pass to a purchaser from them a fee in any property they might sell. This however, throws no light upon the question what estate they have in property which they do not sell. The right to convey a fee does not by any means infer a fee in the person who makes the conveyance. It is quite usual for a testator to give property to one for life and to superadd to the gift a power to sell in fee, and in such instances it is only when the power extends not only to the conveyance of the property, but to the absolute and uncontrolled disposition and use of the proceeds, that such power is construed to expand the life estate into a fee simple. It must be observed here that the power which the trustees have to sell is a power to sell, not for their own benefit, but for the benefit of the fund. The fund is given by the will an individuality apart from the portions of the estate which compose it. These may be changed at the discretion of the trustees; the fund remains. This view of the situation of the fund and the estate of the trustees in it, is illustrated by the decision of the Supreme Court of Rhode Island, *In re Kenyon*, 17 R. I. 149. The testator devised and bequeathed his entire estate to a trustee and his heirs for the life of the testator's son Daniel, with power to the trustees to sell any portion of the property with Daniel's consent. Any of the property which should remain was given, after the death of

Daniel, to the testator's right heirs. Daniel died without ever having had any children, and the property was claimed by Daniel's administrator, on the one hand, and by the testator's then heirs, on the other. At the time of Daniel's death he was the testator's only son and heir. The court held that the estate of the trustee, though in terms a fee simple, and though an express power to sell was given, was nevertheless only an estate for Daniel's life.

II.—*The estate of the equitable devisees of the fund:*

No interest or estate was given by the will to William, Philip or Mary Jane. The portions of the residuary fund which should be given to them, or any of them, was left to the uncontrolled discretion of the trustees. After the death of the survivor of them, however, the residuary fund was to pass to their children and other descendants then living. This gave a contingent remainder to the children and other descendants of William, Philip and Mary Jane. The will expressly says that the fund is to go to such of them as may be living, so that the remainder was contingent with respect to the persons who were to take. Neither William, Philip or Mary Jane ever had a child, so that the problem is not confused by the question, which would have arisen upon the birth of a child to one of them, whether the remainder would then vest in that child or would still be contingent upon his surviving William, Philip and Mary Jane. The remainder in the present case belongs to the fourth class of contingent remainders as they were classified by Mr. Fearne, that is, remainders limited to a person not ascertained or not in being at the time when the limitation is made. 1 Min. Inst. 389, 391; 4 Kent. Com. 207. In the case of *Temple* v. *Scott*, 143 Ill. 290, land was conveyed to a trustee upon trust to hold for a woman during her life, and after her death then to her children if any should survive. This was held to create a contingent remainder to the children who should survive at the death of the *cestui que trust.* See also *Coots* v. *Yewell*, decided by the Supreme Court of Kentucky in 1894, and reported 25 S. W. Rep. 597.

III.—*The estate in the heirs of the testator.*

When a devise is made of a particular estate followed by a

contingent remainder, the fee remains in the heirs of the testator until the happening of the contingency, and remains there as a vested estate. It is, it is true, subject to be defeated and divested by the happening of the contingency, but it remains in them until that event occurs. The fee does not pass out of the testator's heirs and fall back to them as a new estate if the contingency does not happen, which would be to reverse the order settled by the law.

The question presented is the same whether the devise stops after creating the particular estate and the contingent remainder, leaving an intestacy with respect to the reversion, or whether the devise, after creating the particular estate and the contingent remainder, expressly gives the property over on the failure of the contingency either to the testator's heirs or to another devisee. In the one case, the question is whether the heirs as such retain a vested estate, subject to be divested by the happening of the contingency. In the other case, the question is whether the remote devisee take such a vested estate. Thus, in the case at bar, the testator created the particular estate and the contingent remainder, and died intestate as to the reversion. If, instead of doing this, he had provided for the particular estate and the contingent remainder, and then had added a provision that upon the death of the last survivor of William, Philip and Mary Jane, if no children or descendants of either of them should survive, the estate should pass to the testator's heirs at law, precisely the same state of facts would have been presented, and precisely the same questions would have arisen, as now arises in the present case. In like manner, the question would have been the same if the testator had provided that, after the termination of the particular estate and upon the failure of the contingency, the fund should go to some designated person, other than his heirs at law. In all these instances the question is whether the reversioner, or the remote remainderman, has a vested estate. It is because of the identity of the questions that I have deemed it strictly pertinent to cite authorities which have arisen on any one of the three classes of circumstances. I am justified in this course not only by the obvious reason-

ableness of it, but also by the example of the Supreme Court of Virginia in the case of *Stoaks* v. *Van Wyck*, 83 Va. 724. In that case the testator devised land to his daughter for life, and provided that if his daughter should die leaving issue the land was to go, at the daughter's death, to such issue and to his, her or their heirs forever; but if the daughter should die without leaving issue, the land should pass and descend to the daughter's heirs. At the testator's death this daughter was the only heir at law. She sold the property and conveyed it as her own, although she never had issue. At the death of the daughter those who were the testator's then heirs, that is to say, who would have been his heirs if he had died at the same time as his daughter, claimed the property. There was thus presented the same question identically which is presented in the case at bar, except that in that case there was an express devise to the testator's heirs, while in this there was merely an intestacy which permitted the heirs to take by the laws of inheritance. If Mary Jane were dead, and if one of John's children, the plaintiff's, were dead, leaving issue who were claiming from the trustees the share which had already been paid to the father of such issue, the two cases would then be precisely parallel even to the remotest circumstance, except for the difference already noted in the manner in which the heirs of the testator made their claim. There would be the same life estate, the same contingent remainder, the same dispute between the heirs of the testator at his death and those who are called his heirs at the failure of the contingency. The Supreme Court of Virginia held that the daughter, as the heir of the testator, took at his death a vested estate in the land, subject to be defeated by the happening of the contingency, but becoming absolute when the contingency failed. On page 734, however, the court suggests that it may be true that the limitation of the ultimate interest to the heirs of the testator is, in the event of the failure of the prior limitation, tantamount to the testator's dying intestate as to that interest or reversion. In that event, says the court, that interest or reversion would have passed or descended to the daughter of the.

testator as his only heir, and would have vested in interest in her immediately upon the testator's death.

The law favors the vesting of estates, and in doubtful cases leans toward the earliest time at which they may vest. *Cooper* v. *Hepburn*, 15 Gratt. 551. If it were doubtful whether the estate, which must manifestly go to the heirs of the testator in this case at some time, should be held to vest at his death, or only on the failure of the contingent estate, the former rather than the latter time would be adopted. *McArthur* v. *Scott*, 113 U. S. 378. Here the estate vested on the testator's death in his heirs, Philip, Mary Jane and John. Philip having died unmarried and intestate, his interest passed to Mary Jane and John. John having died intestate and leaving no widow, his interest has passed to his children, some of the present plaintiffs. The reversion in this fund is therefore a vested interest in Mary Jane and in John's children, which can never be divested, for the contingency which might have divested it can never happen.

If this undisposed of reversion has not vested in the heirs of the testator, where has it been residing?

It is not in the trustees. Their estate is measured by the beneficial interests given by the will, and there is no disposition made in the will of this reversion. Their estate must absolutely determine upon the death of Mary Jane. Or, if the trustees are still to hold the legal title, then this reversion is an equitable estate in reversion. The equitable estate is not in the trustees but, as was said by the court in *Doe* v. *Considine*, 6 Wall. 469, the same rules of law apply to descents and devises of equitable as to those of legal estates, and if this was an equitable fee in reversion in the testator's heirs, it vested in them in precisely the same manner as it would have done had it been a legal estate.

The title is not in the contingent remainderman, for there are no such persons in being, never have been, and never will be.

The fact that Philip and Mary Jane were not only intended to be beneficiaries during their lives of the income of the fund, and of such of the principal as the trustees might give them, but also occupied, with John, the position of heirs in

whom the reversion vested, does not militate against the principle which is now being insisted upon. In the case of *Stoaks* v. *Van Wyck*, 83 Va. 724, the testator's daughter was the life tenant, was also the person whose death was to occur before the contingent remainderman could take, was also the person whose issue, if she had any, were to take the remainder, and yet was also the testator's sole heir, in whom the court held the remainder or reversion to have vested. See also *Coots* v. *Yewell*, 25 S. W. Rep. 579.

The authorities are abundant and uniform in favor of the proposition that under such circumstances the heirs of the testator take a vested estate. From the case of *Purefoy* v. *Rogers*, 2 Wms. Saund. 380, which was decided by Lord Hale in the reign of Charles II., there has been no departure or dissent down to the present time. Chancellor Kent announces the doctrine as an established canon of the law. 4 Kent Com. 257. The more recent authorities in this country are equally express and unequivocal.

Reference has already been made to the case of *Stoaks* v. *Van Wyck*, 83 Va. 724, as being precisely in point. The case of *Robinson* v. *Robinson*, 89 Va. 916, is quite as apposite, and in it the estate vested as a reversion to the heir of the testator, and not by virtue of a limitation in the will.

The case of *Coots* v. *Yewell*, 25 S. W. Rep. 597, is equally in point. A father conveyed land to his son, Sydney, for life, remainder in fee simple to the children, heirs and legal representatives of Sydney. Sydney was then unmarried, and he never thereafter had any children. After the father's death his other children, the brothers and sisters of Sydney, conveyed to Sydney all their interest in the property. Thus Sydney became entitled to whatever vested estate was at that time in the grantor's heirs. Sydney sold and conveyed the property, and after his death the grandchildren of the grantor, the children of a brother who had joined in the conveyance to Sydney and who had died before Sydney's death, sued for the property. They suggested the same claim which the trustees in the present case suggest on behalf of the possible grandchildren of John, namely, that they took directly as heirs of the grandfather, that their

father and his brothers and sisters had no estate vested in them during Sydney's life, and therefore that they were entitled to the property notwithstanding the deed made by their father to Sydney. The court, held, however, that the remainder to Sydney's children was a contingent remainder, depending on the contingency of their surviving Sydney; that the fee remained in the grantor, notwithstanding the conveyance, and passed to his heirs, so that the deed made by his children, though before Sydney's death, passed the fee subject to be defeated by the happening of the contingency provided for. A petition for a rehearing was overruled. 26 S. W. Rep. 179. In this case it will be noticed that there was a reversion in the heirs of the grantor, and not a limitation to them in the conveyance by which the particular estate and the contingent remainder were created.

In the case of *Havens* v. *Seashore Land Company*, 47 N. J. Eq. 365, the testator devised land in fee tail to his son Elisha with remainder, after the estate in fee tail, to the testator's son John. During Elisha's life, and of course therefore before the failure of the contingency, John executed a conveyance whereby he undertook to convey his right, title and interest to the defendant. Elisha never had issue, so that his estate was really a life estate with a contingent remainder to his issue if he had any. Elisha died and John having died before him, John's children laid claim to the land, insisting that they were the heirs of the testator as of the time of Elisha's death when the contingency failed, and that the estate passed to them at that time. The court, however, held that the remainder in John after Elisha's estate tail was a vested remainder, although it was uncertain before the contingency happened whether it would ever take effect in enjoyment, and therefore that John's deed, being the deed of one who then had a vested estate, passed the title to defendant.

The facts in the case *In re Kenyon*, 17 R. I. 149, have already been stated. In that case there was a trust expressed to be in fee with a power to sell. The life tenant was, as in the Virginia case, the testator's heir and the person whose death was to determine the particular estate and to fix the time

within which the contingency must happen, yet the court held the estate in the life tenant, as the heir, to be a vested estate, and held his administrators and heirs to be entitled as against the claims of those who would have been the heirs of the testator at the time of Daniel's death, if the testator had then died.

In the cast of *Lepps* v. *Lepps*, 16 S. W. Rep. 346, decided by the Supreme Court of Kentucky, 1891, a testator, who died without children, devised his property to his wife and if she should marry again and have children, then to any children she might leave surviving her, and if she should die without surviving children, then to the testator's brothers or their children. Thus, as will be perceived, a contingent remainder after the widow's death was created in favor of any children she might leave surviving her. Before the death of the widow, and while it was still uncertain whether the contingent remainder would take effect or not, one of the testator's brothers, B, died childless and by his will left all his estate to his widow. The testator's widow then died childless, so that the contingent remainder failed. B's widow claimed the property under the will in her favor, and the testator's other brothers claimed adversely to her. The precise question presented by the case at bar was thereupon raised, and the court held that, even during the lifetime of the testator's widow, B had a vested estate in the property, and that his share passed by his will.

In the case of *Hill* v. *Barnard*, 152 Mass. 67, a testator left a fund to a trustee in trust for a son for life, with power in the trustee at his discretion to consume the principal of the fund for the son's benefit. The will provided that, on the son's death, the whole fund was to go to the son's issue, but if the son left no issue the fund was to go to persons named in the will. It will be seen that there was a contingent remainder in the son's issue who might survive him, contingent both upon the surviving of the issue and upon the failure to consume the fund in the son's lifetime, just as in the case at bar the entire fund might be consumed by the trustees for the benefit of the children named in the will. Some of the remote legatees, who were to take on the son's

dying without issue, themselves died before the son, and the testator's son having finally died without issue, the court held that the legatees who died before the son had a vested estate in the fund, and that their shares passed to their administrators.

A great number of authorities, many of which are cited in the cases to which reference has been made, might be brought to the attention of the Court as bearing upon one or the other of the different branches of the proposition under discussion. It has been deemed best, however, to confine the citations to the cases in which the precise question which is presented here has been passed upon by the courts. It will be found that in every one of the authorities referred to in this branch of the case, there was a contingent remainder after a particular estate, and either a reversion to the testator's heirs because of a failure to dispose of the residue after the contingent remainder, or else a limitation over after the contingent remainder. It will be found that in all of them, under a variety of circumstances, the precise question was passed upon, whether this reversion, or this ultimate remainder, was a vested estate pending the time until it should be ascertained that the contingent remainder had failed. In every one of them it was decided that this estate was vested, and in none of their was the determination of the persons who were to take postponed, as the trustees would have it postponed in the case at bar, until the termination of the particular estate and the failure of the contingent remainder.

IV. In the court below it was suggested that the estate of the trustees was, at most, a base or determinable fee limited to last until the death of William, Philip and Mary Jane without descendants. The right of the plaintiffs is so clear upon the theory of the case which has already been discussed that it will perhaps conduce rather to confusion than to clearness to urge this other theory of the case. While the estate of the trustees was to last for an uncertain period, yet as it must necessarily determine at the end of lives in being at the testator's death, it could scarcely with propriety be treated as a fee of any description. As this feature, however, was the subject of elaborate discussion in the Circuit Court, it

may be at least not without interest to present here the authorities which were collected upon that subject.

The plaintiffs urged that, if the estate of the trustees was a base or determinable fee, the right of reverter remained, as a vested estate, in the heirs of the testator; that the consequence of this would be, just as upon the other theory of the case, that the present plaintiffs having vested estates, could receive the fund with safety to the trustees, and that after the death of Mary Jane no one could claim any part of the fund except as claiming through the present claimants. In that case he would of course be estopped by their receipt of the fund. It is not proposed to elaborate this branch of the case, but to state briefly our position with regard to it.

Notwithstanding the statute of *quia emptores,* a base fee can be created in this country. *Universalist Society* v. *Boland,* 29 N. E. Rep. 524, where Mr. Gray's views, as set forth in his essays on rule against perpetuities, are repudiated by the Supreme Court of Massachusetts. See also 2 Min. Inst. 86; *Bolling* v. *Petersburg,* 8 Leigh 224. The right of reverter is a vested estate remaining in the heirs of the grantor or devisor. 2 Min. Inst. 78; 1 Wash. Real Prop. 91 (*64); 4 Kent Com. 11; *Church* v. *Grant,* 3 Gray 142; *Sheetz* v. *Fitzwater,* 5 Pa. St. 116. Our statute law fairly covers the subject. *Ochiltree* v. *McClung,* 7 W. Va. 532.

The case is certainly one which commends itself very strongly to the consideration of the Court. The plaintiffs should have the relief prayed for unless the Court is clearly bound, by some inflexible rule of law, not to grant it. The trustees, of course, have no interest and no desire to prevent this. So long as they can be protected by a decree of the Court, they are more than willing to turn over the fund. The granting of the relief prayed for will be manifestly a very great advantage to Mary Jane, the only survivor of the three children for whose benefit the fund seems to have been primarily created. Should Mary Jane die under the present circumstances she could not direct the disposition of the minutest portion of the fund. Neither those who may be caring for her in her old age, nor those whom she may herself have taken under her protection, nor any who may

have personal claims upon her of affection or gratitude, can derive any benefit from the fund or any portion of it. As is set forth in the bill, the plaintiffs have agreed among themselves that, if the fund can be now divided, a very substantial portion of it, twenty thousand dollars, shall be given to Mary Jane as her absolute property, to dispose of as she may wish. It may well be thought that this amount would in her case greatly help to smooth the footsteps of declining age, and that it would be a great source of comfort to her during the few remaining years of her life, and of pleasure to her at her death, to be able to pay with this her debts of gratitude, or offer her tributes of affection.

With respect to the other plaintiffs, the question of the enjoyment of the fund is between them and their children. If the decision of this question could be left to the children themselves, it is not going far to presume that filial affection would readily accord to the parents the enjoyment of the fund. This ought to be the decision, and the court might well lean, if it were necessary toward a conclusion so proper in itself. But it is unnecessary that such considerations should be emphasized. The right of the plaintiffs is clear under the law, and the decree of the Circuit Court should be reversed.

W. P. Hubbard for appellees, defendants below, submitted the following brief:

The position of the defendants, the trustees under Philip Reilly's will, with respect to this controversy is stated in their answer. They have no personal objection to the decree asked by the complainants, if the will making them trustees would permit such action, and if they could safely consent to such a decree; but they are advised that they can not safely consent, and that the terms of the will do not permit such decree.

Their defense, therefore, while in some sense friendly, is not merely formal.

As the brief for appellants says, it was suggested in the court below on behalf of the defendants (the suggestion being addressed to the appellants' counsel as well as to the

court) that a decree should pass in favor of the defendants in the Circuit Court, because a decree for the complainants, if affirmed by a divided court here, would not protect the trustees, as such affirmance would not under section 4 of art. VIII of the State Constitution be of binding authority in all subsequent cases in all courts of the state, and the decree itself would not be binding upon heirs of Philip Reilly not parties to this suit, in whom the estate might hereafter vest according to the views of the trustees.

That suggestion, however, was not given the slightest weight, either by the Circuit Court or by appellants' counsel, and the decree appealed from was only reached after full and elaborate argument and reargument, oral and written, by counsel, and careful and profound consideration by the court. The value of the judgment of that court is not lessened by reason of that fruitless suggestion of defendants' counsel.

There are some considerations which should be borne in mind throughout the discussion and decision of this case and the influence of which should be felt at every stage.

*First.* The principal defendants are trustees under the will of Philip Reilly and are bound to carry out the trusts imposed upon them by that will.   Before the time fixed by the will for the determination of the trust, the Court is asked to put an end to the trust by its decree and to require the trustees to distribute the trust fund.   The trustees suggest that at the time at which the will requires them to make distribution, which they insist is the time of the death of Mrs. Carney, there may be others than the present plaintiffs entitled to share in the distribution.  If this should be true, these others not being parties to this suit would not be bound by the decree of this Court. The trustees having no personal interest in this matter, but being responsible for the due execution of the trust reposed in them, ought not to be required to yield up their trust and distribute the trust fund, except by a decree which will afford them the fullest protection when they comply with its requirements.   Such persons (other than the present plaintiffs), who may be entitled to share in the distribution at the time it is to be made, may be citizens of states other than West Virginia and so entitled to

resort to the United States Courts. Those courts, while of course giving great weight to the views of this Court, would not be bound by its adjudication upon a question of general law such as is here presented. In the case supposed a decree requiring the trustee to pay would not be of authority against such subsequent claim. Therefore only the clearest convictions upon the part of this Court will warrant it in disturbing the decree of the court below, and any and all doubts entertained by this Court should be resolved in favor of the defendants, so that they may have as nearly as possible that complete protection in acting under the decree if it be adverse to them, which it must be conceded persons in their situation are entitled to.

*Second.* By the twenty second clause of his will, Philip Reilly authorized and required all questions of doubt and controversy arising under his will to be determined, adjudged and finally decided by the trustees. If this clause be valid and controlling, the judgment of the trustees that they can not safely act in the method suggested by the bill should require a decision against the plaintiffs. Such provisions as that contained in the twenty-second clause are valid and will be given effect by the court. 1 Redfield on Wills *442.

*Third.* The question here presented is to be decided according to the language of the will of Philip Reilly unaffected by any consideration of what might have happened or what actually has happened. Jarman's Rule XXI, 1st Redfield on Wills *428: *Outland* v. *Bowen,* 115 Ind. 150-158.

The question would be precisely the same if Mrs. Carney had half a dozen children now living, or William and Philip Reilly had each left as many children still surviving. In that state of affairs there would have been no temptation for wire drawn argument and it would have received scant consideration.

If, as plaintiff claims, there has always been a reversion in Philip Reilly or his heirs, then during the long history of this trust, if there had been trespass or waste on property belonging to the residuary fund or any injury affecting its substance, those heirs would have had a right of action. A reversioner having a vested interest in reversion may sue for

any injury to the inheritance, 4 Kent 455. A reversioner may sue for an injury to property while held by a life tenant. *Harvey* v. *Skipwith*, 16 Gratt. 393.

If the plaintiff's position be correct, these heirs of Philip Reilly might in the case supposed (of an injury to the fund and of a large number of children to Mary Jane, Philip, and William) have brought a suit for such injury. In such a case no one could have been found to suggest that any one except the trustees would have such right of action, and yet, the question is precisely the same as that now presented under different circumstances.

*Fourth.* The plaintiff's theory is that this reversionary right was undisposed of by the will, in other words, that as to this reversion now claimed by the heirs, Philip Reilly died intestate. We deny this and say, that this will did what it says it did, disposed of all the estate of the testator, real and personal. This intent is plainly manifest from the will.

In the question here presented, there is therefore involved the question whether this will is to be construed as if there were a partial intestacy of the testator. If, as we claim, there was no partial intestacy, then the testator's whole estate, including this alleged reversion, was disposed of by the will. The rule is to construe a will so as to prevent intestacy, entire or partial. Thus it is said in *Boston Safe Deposit & Trust Co.* v. *Coffin*, 152 Mass. 95; 8 L. R. A. 740. "Where an intention to dispose of the whole of an estate appears in a will a partial intestacy should not be recognized unless the deficiencies of expression are such as will compel it."

The case was much like the one at bar, the heirs of the devisor claiming that by the failure of issue of a devisee a share devised to him for life reverted to them as not being disposed of by the will, but the court was so adverse to that construction that it practically supplied language in the will to accomplish a different result.

Many cases are cited in the note in 8 L. R. A. to the proposition that a will must be so construed as to avoid a partial intestacy.

The clauses of the will and the facts in the case which the defendants are advised are important are set forth in their answer.

The real dispute between the parties, though it be illustrated by many suggestions and be stated in many different forms, really lies in a very narrow compass. It is whether an estate, a grantable, devisable, descendible estate, in this residuary fund vested in Philip Reilly's heirs at the time of his death or whether there was in them a mere possibility of reverter which could not vest until the death of William, Philip, and Mary Jane, childless.

The importance of the dispute grows out of the fact that when the last named event shall occur, and the estate shall vest according to our views, the heirs of Philip Reilly in whom it will then vest may not be the same as those who now join Mrs. Carney as co-plaintiffs. Some of the present plaintiffs may die in the meantime. The shares which these plaintiffs pray may be paid to them will, as to such of them as may die before Mrs. Carney, turn out to belong to their survivors, whether their children or their co-plaintiffs, and the trustees when called upon by those entitled to these shares at the time when they shall vest, will find no protection under a decree against them in this suit. The question as to the time when these interests vest has been decided by the Court of Appeals in *Whelan* v. *Reilly*, 3 W. Va. 597, 612, a case to which the present litigants were privy, and has been decided upon the admission of the parties. "It is admitted," the Court says, "that the estates bequeathed by the residuary clause must vest, if at all, on the death of the survivor of the three persons, John, William, and Mary Jane."

It will be well to consider the difference between a right of reverter and a possibility of reverter. Of course it is necessary at the outset that the words used in this discussion shall be understood clearly and in the same way by the disputants. No progress will be made if we use the word "right," some of us meaning that which justly belongs to one, and some of us meaning that which one may or may not receive. The plaintiff's counsel said in his argument below that he was unable to conceive of a possibility which is not also a right. He

therefore concluded that right and possibility mean the same thing and that where judges and law-writers say "a mere possibility" he is at liberty to substitute the word "right." These words in their common acceptation may be defined as Webster does. "Possibility. That which is possible; in law a contingency; a thing or event that may or may not happen; a contingent interest in real or personal estate." "Right." That which justly belongs to one; that which one has a claim to possess or own." Anderson's Law Dictionary says: "Possibility. An event which may or may not happen." "Right. An enforceable claim or title to any subject matter whatever."

Plaintiffs' counsel said it was difficult to define this possibility without calling it a right, because it is something which is proper to the grantor and which does not belong to mankind generally. It is possible that a son may hereafter inherit from a father who is still living. It is not possible that mankind generally should inherit from that father. The possibility is proper to that son only. Yet even Mr. Russell would hesitate to say that that son had a right to so inherit.

The fact that a thing is possible to one and not to others does not change the nature of a possibility and transmute it into a right.

It is true that text-writers have in their indexes and in casual reference spoken of a right of reverter, but the text-writers who do this, and all other text-writers, when they come to accurate statement and description, speak of a reverter or possibility of reverter as distinct from a reversion. Thus Chancellor Kent, vol. 4, page 10. "It is a possibility of reverter when the estate determines;" page 11. "But there still existed the possibility of a reverter in the donor;" page 12, "Where the donor had but a bare possibility before."

Prof. Minor calls this a mere possibility of reverter.

If it be a right it is only what Chancellor Harper calls in *Adams* v. *Chaplin,* 1 Hill (S. C.) 268, a "right of possibility of reverter."

Inasmuch as all text-writers, including those who carelessly speak of a right of reverter, always use the term "pos-

sibility of reverter," when they are talking accurately and carefully, it is fair to assume that the latter phrase best describes the claim which the plaintiffs here set up.

A consideration of the real nature of this claim, of what it is and what can be done with it, will supply conclusions useful in the discussion, and will therefore be attempted at this point.

It must be remembered that the plaintiffs' claim is that they have an testate, inherited from Philip Reilly, an estate which he might have devised or granted, an estate as to which he died intestate and which was transmitted to them by descent. In other words, while they admit that what they have is not a reversion, their statement of its qualities shows that it is a reversion.

"A distinction is made, however, between a reversion, which is an estate vested in present, although to be enjoyed in the future, and capable of being transmitted by descent, devise or grant, and a mere possibility of reverter." 2 Minor, 420.

"A reversion is a vested interest or estate and may be conveyed," 4 Kent 354, "but if A has only a possibility of reverter as in the case of a qualified or conditional fee at common-law, he has no reversion." 4 Kent 353.

We can not agree with the suggestion which has been made, that this is an estate on condition. Here is no condition and no breach. No condition is expressed and none is implied. Without discussing this, it is enough to refer to Kent's lecture on Estates upon Condition, 4 Kent. Com. 122, from which much of the learning displayed in the decision of *Brattle Square Church* v. *Grant,* 3 Gray 142, is derived, and from which it will appear how foreign an estate upon conditions is in every respect from the estate devised by the will of Philip Reilly. Whatever possibility or right of reverter there may be in an estate on condition, a right which exists because of the condition, is not important here where we have no condition.

Words of condition render the estate liable to be defeated if the event expressed in the condition arises before the de-

termination of the estate or the completion of the period de-scribed by the limitation. 4 Kent. 126. There are no such words in the case at bar.

Nor is this a case of conditional limitation, because there is no limitation over to a third person if a condition be not fulfilled. This being neither a case of estate on condition or of conditional limitation, the case of *Brattle Square Church* v. *Grant,* which discusses only those estates, is not pertinent here. What we have here is a very different thing, a conditional fee. See 4 Kent 11.

We claim first that the estate devised to the trustees was an absolute fee-simple. If this be so, of course there was no estate remaining in the testator. The estate devised to the trustees was an absolut fee-simple, we say, because of the language of the will which repeatedly, clauses 2, 4, 9, 12, 14, 19 and 22, gives to the trustees all the testator's estate and all his powers with respect to it. The fourth clause empow-ers the trustees to do all acts in relation to the testator's es-tate as fully as he could do if he were in life.

It is nothing to the point to say, that the estate of the trustees will be limited to the purposes of the trust and the legal estate vested in them will be no greater than the equit-able estate given to the beneficiaries. For here the purposes of the trust require that the trustees should have the fee, and the equitable estate in fee which the beneficiaries may take from the trustees requires that the legal estate in fee should be vested in the latter.

It is true as said in *Milhollen* v. *Rice,* 13 W. Va. 526, that if the estate of a tenant is expressly restricted to a life estate a superadded power to him to convey a fee does not create a fee, but as the same case points out, where the estate is not expressly restricted to a life estate, but is expressed in in-definite terms, such a superadded power operates to require the will to be construed to devise an absolute fee simple to the tenant. It will be well to observe here, for the failure to observe it has more than once misled the plaintiffs' coun-sel, that the children, William, Philip, and Mary Jane, have no estate, right or interest in the residuary fund. The trus-tees had the entire estate in that fund. The children might

receive none of the income or all of the income, none of the principal or all of the principal, as the trustees in their uncontrolled discretion might determine. How can it be said in such a case that the estate of the trustees is measured by the estate given to the beneficiaries? Looking at it in another way these three children were not beneficiaries at all.

It was not a mere power to convey that was here given to the trustees. They had that power and more. They could not only transfer the fee to the purchaser from them, but they could transfer the whole consideration received from such a purchaser to any of the three children if they chose and so wipe out so much of the trust fund and end so much of the trust. The purposes of their trust contemplated that they might do everything with Philip Reilly's estate that he could do, bestow all of this residuary fund on these three children, put an end to Philip Reilly's estate and their own estate in this property by transferring it to these children. Such purpose could only be effectuated by putting the fee in the trustees. The same considerations apply if we consider these childrens' children as the beneficiaries spoken of. If any estate should remain in the trustees at the death of the longest liver of the three children, the fee of the residuary fund was to go to the children and descendants of those three children. And for this, the final purpose of the trust, there was the same necessity that the trustees should have the absolute fee simple. This it was the plain intent of the testator throughout his will to give them. The intention of the testator must prevail. The manifest intention must have effect unless some rule of law is violated thereby. *Hinton* v. *Milburn*, 23 W. Va. 166, 171.

It has been said that whether the trustees have a fee simple or not is immaterial, since it is agreed that their estate will be determined by the death of Mrs. Carney, childless. It is immaterial whether their absolute fee simple estate may be determined by the happening of a contingency, but it certainly is not immaterial whether that estate is a fee simple or not, because if they have a fee simple that puts an end to the plaintiffs' claim of an estate remaining in the testator's heirs, for if the testator parted with the fee simple

his heirs could have neither reversions or reverter, right of reverter or possibility of reverter, nor anything else.

The same conclusions follow if the estate devised to the trustees be considered as a fee qualified, base or determinable. In such case, under the statutory provisions of this State, there is no estate remaining in the grantor.

We must first consider, however, whether there can now exist in this state even a possibility of reverter, and involved in that is the question whether there may now be in this state a qualified fee. This question has been thoroughly examined by Prof. Gray in his work on the Rule Against Perpetuities. The conclusion to which he comes is that a possibility of reverter can not exist in West Virginia, or indeed in any state except in Pennsylvania and South Carolina, sections 31, 24, 39, or in England. *Id.* section 23. Possibilities of reverter are not valid interests. *Id.* sections 34 to 37.

In Pennsylvania tenure exists, and a qualified fee may be valid. *Id.* section 38. But in the other states there is either no tenure or the statute *Quia Emptores* is in force and in neither case can there be any possibility of reverter. Section 39.

But if we concede that the fee devised was not absolute, but only conditional at common-law, and that such conditional fee might now exist in this state, still no reversion remained in the donor "because the grantee of such an estate was considered as having the absolute property of it and the donor had only a possibility of reverter, not an actual estate in reversion." 1 Lomax Digest 603.

The interest abiding in a grantor of a qualified or defeasible fee or of an estate in fee to a corporation is not a reversion which is an estate, but the possibility of a reverter. *Id.* 604.

A conditional fee at common-law was by the statute *De Donis* turned into an estate tail and then a distinct estate in reversion arose in the donor. 1 Lomax 503; 4 Kent 353.

Our statute has turned an estate tail into an absolute fee-simple, thus wiping out the reversion. This is an estate in fee conditional, 2 Minor's Inst. 78; it was to go to the children and other descendants of William, Philip, and Mary

Jane. This estate in fee conditional was converted into an estate tail by the statute *De Donis*, 2 Minor's Inst. 78.

On the 7th day of October, 1776, this fee conditional would have been an estate tail, but by the Virginia Acts of Assembly of 1776 and 1785, the provisions of which are retained in our Code, chapter 71, section 9, such an estate shall be deemed a fee simple.

So if we consider this a fee conditional at common-law, instead of a fee simple absolute, still we find that by reason of the statute adverted to this has become and is a fee simple absolute. Having devised a fee simple absolute, there could have been no reversion or even possibility of reverter in the testator or his heirs.

The last clause of this section has been referred to as intimating that there may be a reversion after even a fee simple. That clause is as follows: "And every limitation upon such an estate shall be held valid, if the same would be valid when limited upon an estate in fee simple created by technical language." The words "fee simple" can not here mean absolute fee simple, such as we claim to have passed by Philip Reilly's devise to the trustees. That would be a contradiction in terms. If the whole estate was devised, no reversion could remain, and so Judge Hoffman says in *Ochiltree* v. *McClung*, 7 W. Va. 245. "It may be remarked that in one of the provisions before quoted, there is a reference to an estate limited upon a fee simple. The limitation of a fee absolute to one person and an estate over to another is a contradiction. A fee qualified or conditional, or a less estate is necessarily implied in a limitation over" and the judge points out that there is authority for the use of the phrase "fee simple" as including not only fee absolute but fee qualified or conditional.

We can not claim that *Ochiltree* v. *McClung* is authority on this question, for all that is quoted by either Mr. Russell or myself is *obiter dictum*, the only question for decision in that case having been whether an appointment by writing witnessed by two persons was good under a will which required such appointment to be witnessed by three, a question which certainly did not call for the discussion we find in the report.

But what Judge Hoffman says is instructive and reasons strongly with us. Remember that we do not deny that the residuary fund will revert at Mrs. Carney's death, and will then vest in the heirs of Philip Reilly, then living. We claim that it will revert, but will do so at Mrs. Carney's death and not before then—that it will vest then and not before then. Plaintiffs, on the other hand, claim that it always remained in Philip Reilly during his life and vested in his heirs at his death. The Judge says, 7 W. Va. 246: "The owner of land in Virginia might, before the Code took effect in 1850, or may now, by deed of bargain and sale, upon a valuable consideration however small, paid by the immediate bargainee, or acknowledged to be paid, convey, limit, and vest the legal estate to and in such bargainee, in fee, either for his own benefit or for the benefit of others, and, by the same deed, *on the happening of a contingent event,* divest the estate out of such bargainee and vest it in another person; whether at the time of the execution of the deed the latter is ascertained or in existence, or not: Or, the owner may, by the deed, reserve to himself, or confer on the bargainee, trustee, or other person, a power to revoke and appoint the estate, and provide that *upon such revocation and appointment* the estate *shall vest* in the appointee: And in th former case, *upon the happening of the contingency,* and in the latter, *upon the proper execution of the appointment,* according to the provision in the deed, the estate—legal as well as equitable—*will vest* in the party named or described in the deed of appointment: Or the owner may, by the deed, provide *that upon a contingency* or *the failure to appoint,* the estate *shall determine* in the immediate bargainee for his own benefit or in trust, without declaring its further destination: And *in the latter* case the estate *will revert* to the bargainor or his heirs."

In all these cases, as appears by the language of the judge, the estate devised must determine before there is any reverting or vesting. The estate here devised will determine of course only with the death of Mrs. Carney.

Of course it is impossible that that which will not vest until Mrs. Carney's death could have been inherited from

Philip Reilly, and it is just as impossible that a possibility of reverter could be conveyed, devised or inherited. It may be released, but it can not be alienated.

This brings us to consider whether such a possibility of reverter may be alienated. When valid possibilities of reverter existed, they could not be alienated. Gray on the Rule Against Perpetuities. Sections 13, 14. That means that they could not be granted, devised or inherited.

Upon the question here involved and which presents itself in various forms, the case of *Adams* v. *Chaplin*, 1 Hill (S. C.) 265, referred to by the Circuit Court, is precisely in point. Two opinions appear in the report, one by the chancellor and one by the appellate court. They reached the same result, differing only upon the question whether a conditional fee can merge in the possibility of reverter. It will be remembered that South Carolina is one of the two states, according to Prof. Gray, in which a qualified fee, and therefore a possibility of reverter, may exist. Both these opinions accord with our claim as to the time when anything shall vest in the heirs of Philip Reilly, and as to the nature of a possibility of reverter. Thus the chancellor says page 268, "At the death of John Chaplin, the elder, his son John, was his heir at law, and the right of possibility of reverter, which his father had in the land, is supposed to have descended to him. On the part of the complainants, it was argued that those must take who answered the character of heirs of John Chaplin, the elder, at the time the estate of John Chaplin, the younger, determined; according to the rule laid down by Cruise, in his Treatise on Real Property, 3 Vol. 412, tit. XXIX, chapter IV 2, 'that where a person entitled to an estate in remainder or reversion, expectant on a freehold estate, dies during the continuance of the particular estate, the remainder or reversion does not descend to his heir; because he never had a seisin to render him the stock or root of an inheritance; but it will descend to the person who is heir to the first purchaser of such remainder or reversion, at the time when it comes into possession.' 'Thus it was laid down by the court of King's Bench, in 34 Eliz., that of a reversion or remainder expectant on an estate for life, or in

tail, there, he who claims the reversion as heir, ought to make himself heir to him who made the gift or lease, if the reversion or remainder descend from him; or, if a man purchase such reversion or remainder, he who claims as heir, ought to make himself heir to the first purchaser.' The doctrine is very fully illustrated by Cruise, in the chapter referred to, and I have little doubt is applicable to the present case. Our act of distributions has so far altered the English law, that actual seisin is no longer necessary to enable one who has a present title to an estate, to become the stock or root of inheritance. It provides for distribution, 'when any person possessed of, interested in or entitled to real estate in his own right in fee simple,' shall die intestate. This, I suppose, would be held to apply to a reversion or remainder, after an estate for life, or an estate tail, if such were allowed in this country, because such a remainder or reversion is an estate of fee simple. But the authorities are, that the right of reverter after a fee simple conditional, is no estate in the land, but a mere possibility, and therefore it is, no remainder can be limited after the preceding fee. This right then, I suppose, is not affected by the act, but must go as at common-law to the person who can make himself heir to the grantor of the fee conditional, when that estate determines." Again he says on page 270. "The difficulty arises from what is said concerning the nature of the right which remains in the donor of a conditional fee simple—that is no estate or interest, but a mere possibility, which can not be granted or assigned. Co. Lit. 18a." And on page 271, he says: "Now the possibility which remains in the donor, after the grant of a fee simple conditional, is, certainly, in its nature, capable of being surrendered or released though not of being granted or assigned."

The court of appeals, speaking through O'Neall, say, page 276: "It seems to be agreed by all the books that a fee conditional is a fee simple." Again: "He that hath a fee simple conditional or qualified hath as ample and great an estate as he that hath a fee simple absolute; so as the diversity appeareth between the quantity and quality of the estate." 1 Co. Lit. (by Thomas, Am. Ed.) 583 18a. "From this

it would seem, that the only difference between the two estates, is as to the possibility of duration, but that as to quantity they are the same. The fee is in the tenant in fee conditional, subject to be divested on his death without heirs of his body; but it is an estate which descends from him to the heirs of his body."

And again, "from these authorities it seems to be clear that the whole estate is in the tenant in fee conditional, and that no estate is left in the grantor."

The court continue. "This brings us to inquire, what is the possibility of reverter? Is it an estate? I think not. For it has nothing like an estate about it. It is neither a present nor a future right. It is a mere possibility. Upon the happening of a condition the right may arise; but until then it is nothing but the mere remembrance of a condition upon which a present estate may be defeated, and a future one arise in any one who may be in *esse* and claim as heir to the donor. In the argument of Anthony Brown, one of the judges in C. B. in the case of *Willion* v. *Berkley*, speaking of the reversion under the *statute de Donis Conditionalibus*, it is said. 'For although the land should revert to the donor, before the act, this is no proof that he had a reversion, for an absolute fee simple shall escheat to the lord at this day, and yet the lord has no reversion. So the reverter of the land to the donor upon condition in law, does not prove that the donor had a reversion; for indeed he had no reversion, but the donee had the fee simple, and consequently the whole estate.' Plowd. 247. This opinion of Brown (who is described by Plowden, at page 356, to have been a judge of profound learning and great eloquence) contains the substance of all the learning on the subject, and shows most clearly that the possibility of reverter is not an estate. It is as he intimates, more like an escheat in possibility than anything else. Land may escheat for the want of heirs in the tenant in fee; but this possibility is no estate. So land may revert to the donor, on the failure of heirs of the body of the tenant in fee conditional; but until it occurs, there is neither right or possession, to be holden or inherited. It, however, is said, it can be released. This is true, and yet it

does not follow that it is an estate. A condition, as was very properly said in the argument, may be released, and this is exactly what is done, when the possibility of reverter is released. The condition upon which the land is to revert to the donor, is destroyed."

Upon the question of the heritability of a possibility of reverter, the court say: "To examine this as it should be, it is necessary to be satisfied, first, whether there is any such thing as a descent cast of the possibility of reverter. We have seen that it is no estate, and unless it is, it can not be inherited. The possibility of escheat to the lord paramount, in England, never was supposed to be inheritable. It is an incident of the estate granted, and upon failure of heirs; the land revests in the lord upon office found. In the fee conditional, this land reverts and revests in the donor or his heirs, the moment there is a failure of heirs of his body, by operation of law. Until this occurs, there is nothing to inherit. If it is inheritable, then it may be devised; for, whatever is the subject of inheritance, is the subject of devise. If that is so, the devise over to William is a devise of the possibility of reverter, and would not have descended to John, the heir and tenant in fee conditional. But it can not be devised. For an executory devise over, after a fee conditional, is too remote and can not take effect, unless it be accompanied with such words as will restrict the failure of the heirs of the body, to a dying without leaving issue, at the death of the first taker. *Mazyck* v. *Vanderhorst,* decided February term, 1828, at this place. If it can not be devised, it can not be inherited, seems to be the necessary consequence."

The case of *Outland* v. *Bowen,* 115 Ind. 150, is equally pertinent. The syllabus states the case as follows: "In 1855, B. executed a warranty deed conveying land to his grand daughter for an expressed money consideration. Following the description was written the stipulation that if the grantee should die, leaving no children, the land, or its proceeds that might be realized by sale or otherwise, should revert to the lawful heirs of the grantor; and, also, if the guardian of the grantee saw fit to sell the land, he could do so, by

appropriating the proceeds of the sale to the use of the grantee while she should live, and then applying the balance, if she should die without heirs of her body, to the heirs of the grantor. The grantee died in 1883, while in possession of the land, leaving no children, but leaving a husband and mother as only heirs at law."

"Held, that the estate created in the grantee is not an estate tail, but a conditional fee, liable to be defeated only by the two contingencies (1) that the grantee should die childless, and (2) that the grantor, prior to that event, should have died leaving lawful heirs competent to take the estate limited over."

The court say pages 153-154: "Of the estate created by the deed to Rebecca F. Bowen, we may say, primarily it was a fee simple, and, notwithstanding the condition subsequently written in the deed, the estate was liable to become absolute and continue perpetually in the first taker, her heirs and assigns. 1 Washb. Real Prop., pp. 61, 62. This creates in her a fee simple conditional, or a fee of a determinable or conditional character. *Smith* v. *Hunter*, 23 Ind. 580; *Clark* v. *Barton*, 51 Ind. 165; *Greer* v. *Wilson*, 108 Ind. 322; Tiedeman Real Prop., § 26; Gray Rule against Perpetuities, § 14

"It was necessary that two contingencies should arise or exist concurrently in order that the estate created might be defeated. One was, that the grantee of the precedent estate should die without leaving a child or children surviving. The other was, that the grantor prior to that event should have died leaving lawful heirs competent to take the estate limited over. *Hennesy* v. *Patterson*, 85 N. Y. 91.

"The land was conveyed in fee to the first taker, and it remained uncertain until her death whether the estate conveyed would be defeated by the condition in the deed, or become absolute, and it could not be known until the death of the grantor, who would take as his lawful heirs. Since it was doubtful whether either of these contingencies would happen, the grantor created a fee in the grantee, and there remained in the grantor no future estate in reversion, but

only what is called a naked possibility of reverter. Tiede-man Real Prop., § 385."

And on pages 155 and 156. "It must follow, therefore, if there was no estate left in the grantor after the creation of the precedent estate, vested in the first taker, he would create no remainder, as a remainder can only be created out of the estate left in the grantor after the creation of the particular estate. After the conveyance of an estate in fee, whether the fee be base, determinable or conditional, there is nothing in the nature of an estate in the grantor out of which to create a remainder. It has, therefore, been laid down as one of the fundamental rules in respect to the disposition of real estate, that a remainder can not be limited to take effect after a fee; or, in other words, where there is no reversion there can be no remainder. Tiedemann Real Prop., § 398, and cases cited in note; *Huxford* v. *Milligan*, *supra*."

It was conceded for the plaintiff that at common-law a fee can not be limited after another fee, but it is said that that proposition does not aid us because the reason of the rule is that such limitation would transgress the rule against perpetuities. The rule has no such reason and needs none such. It is unnecessary to obscure this question by raising the dust from old books. It has nothing to do with perpetuities. There is a plain mathematical reason for this conceded rule. It is that after a man gives all he has he has nothing left. "Upon the grant of a fee simple whether absolute or qualified, there can be no reversion, for the fee simple is always the whole." 2 Minor's Inst. 420.

The reason referred to by counsel relates to executory devisees as appears by *Brattle Square Church* v. *Grant*, and he can not be permitted to darken counsel by assigning it to a proposition which does not need it and with which it has nothing to do.

The plaintiff's counsel at one time stated his position in this way. "Remembering to limit and define the estate of the trustees by the equitable estate of the beneficiaries, let us see what estate was devised in the fund. William, Philip and Mary Jane, and the survivor of them, take the equita-

ble life estate in the fund. The remainder after this life estate was given to the 'children and other descendants then living of my three last named children or such of them as may have a descendent then living.' At the time of the testator's death, neither of these three children William, Philip and Mary Jane had any children or other descendants, and none have been since born. The devise then was of an estate for life in the fund with a remainder to persons not designated, not yet in existence, and who could not be determined until the death of the last survivor among the life-tenants. The remainder then was a contingent remainder belonging to the fourth of Mr. Fearne's Classes, 2 Min. Inst. 391-2; 4 Kent. Com. 207-208."

This statement is full of errors as we have already seen. William, Philip and Mary Jane did not "take an equitable life estate" in the fund. They had no interest in it whatever, being dependent on the uncontrolled discretion of the trustees. This is established by the decision of the Court of Appeals with respect to this will in a cause the parties to which were Mrs. Carney and the ancestors of the other plaintiffs on the one hand and the predecessors of these trustees on the other. This decision is not only authoritative because decided by the Court of Appeals, but is binding upon the present litigants because they were practically parties to it. In that case the Court says: "By no construction of the language used in the nineteenth clause of the will can it be held that the testator intended to give to the said William, Philip or Mary Jane, or to either of them any vested interest in the said residuary fund, or in fact any interest in said fund."

"By the fourteenth clause there is an absolute disposition of the residuary fund in trust for the children and other descendants of the said William, Philip and Mary Jane, living the time of the death of the last survivor of the said per-

all the interest which the said William, Philip and Mary Jane could have in the residuary fund is dependent on the uncontrolled discretion of the trustees, and is therefore a contingent interest."

The devise in this will then was not an estate for life in the fund with a remainder, *etc.*, as claimed by the plaintiffs' counsel.

Nor is the question put by him "where was and where is the inheritance" at all troublesome. It certainly was and certainly is in the trustees. As is said in the case last referred to "there is an absolute disposition of the residuary fund in trust, *etc.*" Something has already been said by me in support of the proposition that the trustees took a fee simple absolute and I desire here to add only what is said on a similar question in *Outland* v. *Bowen*, 115 Ind. 157, 158, 159. "The rule that a remainder in fee can not be limited to take effect after an estate in fee, is especially applicable in case the grantee of the precedent estate has, as is the fact in the present case, a general power of disposition, thereby leaving the limitation over to operate only upon what is left at the death of the first taker. In such a case, the limitation over can not take effect either as a remainder or as executory interest. Tiedeman Real Prop. § 298 and note."

"Another and an independent reason why the limitation over is void and of no effect is, that the deed confers upon the taker of the precedent estate a general and unlimited power of disposition. This feature of the case need not be enlarged upon. As has been remarked, the deed created primarily an estate in fee in the grantee, subject to a condition, however, that upon the happening of a certain contingency the land, 'or its proceeds that may be realized by sale or otherwise, are to fall back,' *etc.* By necessary implication this conferred the power upon, and recognized the right of. the grantee, on arriving at the age of twenty one years, to dispose of the land. After conferring an unrestricted power of sale the attempt to hold on to or control the proceeds realized was futile. Whatever the intention of the grantor may have been, the power of disposition was ˙al to the limitation over, the rule in such cases being t      ᴸ absolute power of sale in the first taker renders a subse     ᴸt limitation over repugnant and void." *Gifford* v. *Choat*     .00 Mass. 343; *Hale* v. *Marsh*, 100 Mass. 469; *Ramsdell* v.     ᴢms- *dell*, 21 Me. 288; *Jones* v. *Bacon*, 68 Me. 34; *Van Go˙der* v. *Smith*, 99 Ind. 404.

Any claim that the remainder in fee to the children or descendants of William, Philip and Mary Jane is a contingent remainder and not an executory devise is unfortunate in antagonizing another decision of the Court of Appeals with respect to this same will and to which the present parties are privy. *Whelan* v. *Reilly,* 3 W. Va. 612, where it is expressly considered to be an executory devise. It lacks one of the "distinguishing characteristics of a contingent remainder, there being" as has been already shown no "particular estate of freehold to support it."

If the plaintiffs' counsel had been right instead of wrong with reference to the existence of a life estate, still the consequence argued by him would not have followed. The fourteenth clause giving the fund to their "children and descendants," words of limitation and not of purchase, would have been a gift to William, Philip and Mary Jane, and the heirs of their bodies, and so would have created an estate tail which the statute would have converted into an estate in fee simple. *Moon* v. *Stone,* 19 Gratt. 130-327. It is obvious that the latter position taken by the plaintiffs' counsel sins even more than his earlier position against the rule forbidding such a construction as will work a partial intestacy. For if the plaintiffs' later proposition be right, a still larger estate in the testator's property was left undisposed of by his will. The Court will lean against such a construction, as has been already pointed out.

HOLT, PRESIDENT:

On appeal taken by Mary Jane Carney and others, plaintiffs, from a final decree of the Circuit Court of Ohio county, entered on the 9th day of June, 1894, in favor of John J. Kain and others, trustees, defendants, dismissing the bill without reservation.

The suit involves the will of Philip Reilly, deceased, late of the city of Wheeling, W. Va., especially the residuary fund created by the will, and whether the plaintiffs, Mary Jane Carney, the daughter of the testator, and the children of his son, John Reilly, deceased, are entitled to have that fund now turned over to them by the trustees under the will.

Philip Reilly, being the owner of real and personal property of the value of some one hundred and fifty thousand dollars, departed this life on the 24th day of June, 1866, leaving the will which gives rise to this controversy. On the 10th day of July, 1866, on motion of R. V. Whelan, the executor, the will was duly proved and admitted to record, and the executor gave bond, qualified and entered upon the discharge of his duties.

On two former occasions this will has been before this Court, where it will be found set out with sufficient fullness to determine its meaning and effect: (1) in the case of *Whelan* v. *Reilly* (1869) 3 W. Va. 597, where this Court, reversing the court below, held, *inter alia*, the will to be valid. (2) In the case of *Whelan* v. *Reilly*, 5 W. Va. 356, decided in 1872, where the Court, reversing the court below again, held the language of the fourteenth clause to be clear, the meaning of the testator plain, the will valid as not being inconsistent with any rule of law, and that the court had nothing to do but to see that the same was carried into effect.

Clause No. 1 made provision for the wife, to be taken in lieu of dower; but she died in the lifetime of the testator, and there is a residuary clause.

By clause No. 2 he devised and bequeathed all his estate, real and personal, to Richard V. Whelan, Henry Moore, and Charles W. Russell, of the city of Wheeling, as trustees.

By the codicil, Alonzo Loring was substituted as trustee in place of Charles W. Russell. Richard V. Whelan having died, Josiah F. Updegraff was appointed in his place, he having died, the present trustee, Thomas O'Brien, was, on the 26th day of April, 1876, appointed in his place; and, Henry Moore having resigned, John J. Kain was, on the 2d day of January, 1880, appointed in his place. All this was duly done in pursuance of clause No. 3, so that the present trustees are the defendants Alonzo Loring, Thomas O'Brien, and John J. Kain; Thomas O'Brien being also the executor *d. b. n. c. t. a.*

By clause No. 4 the trustees were given power (which might always be exercised by a majority) to sell, lease, con-

vey, manage, and dispose of his estate, and of every part thereof, and do all other acts in relation thereto, as fully as the testator could have done if in life, except so far as the exercise of such general powers would in any case defeat a particular intention or provision of the will. The trustees still have intact the Marshall county land, of three hundred acres, and the Glen run tract, of about two hundred and eighty acres. All the other property real and personal, except the one hundred acres devised to the children of his son John Reilly, has been converted into money, and invested as part of the residuary fund.

By clause No. 5 he provided for six of these plaintiffs, *viz*: the children of his son John, by setting apart for them by metes and bounds one hundred acres of the four hundred acre-tract situated in Marshall county. John is dead, and his children took it in fee simple; but he died after the death of the testator, and his personal representative is not a party to this suit, and he is not a necessary party, for the personal representative of the testator represents the personal fund · so far as the children may come to have any interest. Here the will contemplates that the executor shall be subject to the order of the trustees, pay over to them, and in general manage as they direct. In such case the modern doctrine seems to be that the trustees deal directly with the beneficiaries, not only in paying legacies, but in making distribution of any part which goes under the statute of distribution.

By clause No. 6 he made a similar devise of the remaining three hundred acres of the Marshall county tract, to be held in trust in fee simple for the children of his son William. But William died in the lifetime of his father, never having married, and leaving no child or other descendant; and this executory limitation in trust to the children of William, who never came into being, became incapable of taking effect, and passed into the residuary fund, by the express language of the will as well as by operation of our statute of wills (Code Va. 1860, p. 574, c. 122, ss. 11, 14). And as the will, both as to real and personal estate, speaks and takes effect as if it had been executed immediately before the death of the testator, the second clause and twelfth clause of the will

operate to make it a part of the residuary fund, which was set aside to be held or invested in good and safe real estate securities.

The law is well settled that where a will expressly or by necessary implication directs land to be turned into money, and such conversion is necessary to carry out the special object of creating the fund, or the general scheme of distribution, equity will treat that which is directed to be done as already done, and treat the land, for purposes of devolution and the transfer of title, as already converted into personal estate.

The personal representative is the proper representative of the personal estate, and is a proper and generally a necessary party in a suit in which the court passes upon the construction of a will affecting a residuary fund not thereby disposed of. But this question of equitable conversion, if any, is not now deemed important, (1) because the trustees take all the property absolutely as active managing trustees, whose trust is to continue until all its feasible objects and purposes shall be accomplished; and (2) because, as to the property in question, regarded as that of the testator, it is agreed that defendant O'Brien is before the court both as executor *d. b. n. c. t. a.* and as trustee, and the limitations of an equitable estate created out of land and money are governed for almost all practical purposes by the same rules. Upon the doctrine of equitable conversion, see *Ackroyd* v. *Smithson,* 1 Brown Ch. 503; *Attorney General* v. *Hubbuck,* 13 Q. B. Div. 275, 289; and on equitable conversion by trustees or court, see *Steed* v. *Preece,* L. R. 18 Eq. 192; *Id.* Brett Lead. Cas. Mod. Eq. 61, notes.

By clause No. 7 the testator made an executory, equitable limitation in fee of the home farm, called the "Glen Run Tract," of about two hundred and eighty acres, to the unborn child or children of their descendants and the survivor whom his son Philip should leave at his death. After the death of the testator, and therefore after the will had ceased to be ambulatory, the son Philip died, unmarried and intestate, leaving no child or other descendants, so far as appears by this record. This executory equitable devise failing to

take effect the Glen run land, by virtue of the twelfth clause, passed into and became a part of the residuary fund. His next of kin are parties, but not his personal representative. This clause throws some light on the present question of partial intestacy, and the effect of section 13, chapter 77, Code, W. Va. p. 660 (Ed. 1891); section 14, chapter 122, Code Va. (Ed. 1860) p. 574. See *Hoke* v. *Hoke* (1878) 12 W. Va. 427, 465. Whether he ever claimed or attempted to sell or transfer any interest in this fund as coming to him by intestacy or otherwise does not appear in these pleadings.

By clause No. 8 it was provided that clauses 5, 6 and 7 should be so construed that if any one child of any one of his said three sons should attain the age of twenty one years, and before that time another child of the same son should have died, leaving a descendant, the descendant of the deceased should have the share which the deceased would have had if living. This has a bearing here as helping to show the general plan or scheme of the will.

By clause No. 9 he directs the trustees to sell all the rest of his real estate as soon as they should find it expedient, and convert all his personal estate into money. Both have been done, and the money has been invested as belonging to the residuary fund, appearing to amount on the 31st day of December, 1892, to the sum of forty one thousand nine hundred and fifteen dollars and sixty one cents, subject to certain deductions for compensation to the trustees and their agents, and perhaps for other things.

By clause No. 10 the trustees were authorized to sell at their discretion, to be exercised within two years, the Marshall county land, of three hundred acres, putting in its place in clause No. 6, his farm lying east of and near the city of Wheeling. But this substitution was not made, but the farm near Wheeling was sold.

Clause No. 11 provided for the investing of any money arising under the will to the amount of ten thousand dollars, to be invested in bonds of the state of Virginia, and to pay the income thereof to his daughter Mary Jane, the plaintiff, during her life, or until she should marry. In 1869 she married Philip Carney, who died on the 9th day of September,

1874. She has remained a widow, has never had any child, and, in the course of nature, can have none, being sixty five years old. In addition to the income from the ten thousand dollars in Virginia bonds and from the mansion house, *etc.*, of the home place, the trustees, from the 3d day of May, 1876, paid her six hundred dollars per year. Afterwards, by decree entered on the 30th day of May, 1884, by the Circuit Court of Ohio county in the chancery cause of *Mary Jane Carney* v. *Alonzo Loring et al.*, trustees, said trustees were directed to pay her twenty thousand dollars on or before the first day of July, 1885, and one thousand five hundred dollars per year during her natural life, out of the residuary fund, in lieu of the sum of six hundred dollars per year, the annual payments theretofore made to her by the trustees; the annuity of one thousand five hundred dollars to commence and be computed from the 1st day of July, 1884, including that day, and to be payable thereafter quarterly in advance. These payments the trustees have so far continued to make.

Clause No. 12 created the residuary fund now composed of the forty one thousand nine hundred and fifteen dollars and sixty one cents, already mentioned, and the two tracts of land, *viz.* the tract of three hundred acres in Marshall county and the Glen run tract of about two hundred and eighty acres above Wheeling on the Ohio river in Ohio county. This is the fund which plaintiffs claim they have the right to have turned over to them by the trustees, and pray that it may so be directed, and that it may be distributed between them in the proportions agreed upon and set forth in their bill. This right the defendants, in their answer, deny, alleging that no one has such right until after the death of the plaintiff Mary Jane, when, the objects of the trust having been fully accomplished, it would go, in equity, to those who might then be the heirs at law and distributees of the testator.

Clause No. 13 directed that the income from the residuary fund should become part of the principal until the death of the last survivor of his three children, William, Philip and Mary Jane, unless the trustees should think proper to apply any part of such income to the support and maintenance of

any or all of his said three children and families, but such application should be made only according to the uncontrolled discretion of the trustees. It does not appear, nor is it now necessary to ascertain, what if any, of such income, etc., from the real estate, remains on hand. We have already seen that William died in the lifetime of the testator; Philip died soon after the death of his father; and that Mary Jane, the sole survivor, was paid twenty thousand dollars on the 1st day of July, 1885, and since that time has been receiving quarterly the sum of one thousand five hundred dollars per year.

Clauses Nos. 14 and 19 read as follows: "Fourteenthly. After the death of the last survivor of my three children, William, Philip, and Mary Jane, the said residuary fund shall be held in trust for the children and other descendants then living of my said three last named children, or such of them as may have a descendant then living; and all such descendants shall have equal shares, as among themselves, without regard to any difference in degrees of relationship or descent." "Nineteenthly. Notwithstanding anything hereinbefore contained, I desire to confer on the trustees power to encourage my three children William, Philip, and Mary Jane to conduct themselves well through life, and with that view do hereby authorize the trustees, whenever and as often as they shall think the same deserved by the good conduct of my said last named three children, or either of them, to advance and give to them, or either of them, any part or parts of the said residuary fund, whether principal or interest, in money or otherwise, without being accountable for the same to any person whomsoever, the power hereby given to dispose of the said residuary fund to or among my said three last named children, or either of them, being limited and controlled only by the discretion and judgment of the trustees."

Clause No. 15 gives to each son fifty dollars in discharge of any claims against the estate.

Clause No. 16 gives the trustees power to fulfill all the testator's contracts remaining unfulfilled at his death.

Clause No. 17 provides that the trustees shall not be responsible for the acts or omissions of each other, and shall respectively receive a reasonable compensation for acting as such trustees.

Clause No. 18 provides that the phrase "the trustees" shall be held to signify the persons who at the time referred to shall be the actual trustees under the second or third clause of the will, and that the act, *etc.*, of a majority shall be effective and binding.

Clause No. 20 refers to and provides for the execution of a deed of trust which was contemplated in aid of the trusts created by the will. I lay no great stress upon this clause, but it may have some bearing in the construction of the settlement created by the will as tending to show that he did not regard it as perfected, or in all respects, perhaps, completely declared, so that it might to some extent be regarded as an executory instrument, for in construing executory trusts in the sense of trusts not perfected or completely declared, the court exercises a large authority in subordinating the language to the intent. L. R. 4 H. L. 543. See *Lloyd v. Brooks*, 34 Md. 27; *Swan* v. *Frick, Id.* 139. For distinction between executed and executory trusts, see opinion of Mitchell, J., in *Gaylord* v. *City of Lafayette* (1888) 115 Ind. 423, 429 (17 N. E. Rep. 899); 27 Am. & Eng. Enc. Law, p. 12, note 1. But this executory clause is evidently confined to its own subject-matter and can, at least, have no direct apparent reference whatever to the residuary fund.

Clause No. 21 appointed Charles W. Russell executor, who never qualified.

Clause No. 22 authorized and required all questions of doubt or controversy arising under this will to be determined, adjudged and finally decided by the trustees. Counsel for defendants claims that this provision is valid, and that in this case, in view of the uncontrolled power and discretion in the premises vested in the trustees, effect should be given it. How far such a clause may be valid, and to what extent it may be given a controlling effect in the view here taken, can not arise, and is not discussed.

Clause No. 23 provides that no husband his daughter Mary

Jane might have should have any title to, interest in, or control over any property which might come to her under the will, or which she might receive through any power given the trustees. She married, as we have seen, and her husband is dead. The effect of the codicil has already been stated.

Plaintiffs claim that inasmuch as there is now no possibility of Mary Jane, the sole survivor, having children, or leaving any descendant—a fact conceded by defendants in their answer—they have a right to have this residuary fund turned over to them, and distributed, and this upon the principle acted upon in the cases of *Macomb* v. *Miller*, 9 Paige 265; *Male* v. *Williams*, 48 N. J. Eq. 33, (21 Atl. 854); and *In re Brown's Trust* L. R. 16 Eq. 239.

There is no controversy about the facts, but the defendants the trustees deny and resist such right, setting up in their answer (1) that their trust is an active and continuing trust, the purposes of which have not been accomplished, and can not be until after the death of Mrs. Carney, one of the plaintiffs; (2) because it will go to the heirs, *etc.*, of the testator living at her death, and who they may be can not now be known. The same reasons, so obvious, which prompted the giving of such full management and control of the fund to the trustees, in their opinion, still exist, and that it is in no way made manifest that such intention of the testator should not prevail. It was his to give, and therefore his to say when and how it should be given. That such intention that the trust should outlast the life of the longest liver is not ambiguous, nor are the trusts, so far as declared, in any respect ill defined, but they are expressed as clearly and made as certain as the nature of the subject-matter permits.

The scheme of the will as a whole, and the scope and tenor of each and every disposing clause, as well as the one here brought in question, show with a clearness too plain to admit of any reasonable doubt the intention of the testator to be that his children William, Philip, and Mary Jane were to take, as matter of right, no part whatever of the inheritance of the residuary fund, but that, as a reward of good conduct, and an incentive to its continuance—by that in good part no

doubt meaning a shown capacity and disposition of prudent management—the trustees were authorized, by express words set forth in the nineteenth clause, to advance and give to them, or to either of them, any part or all of the residuary fund, principal or interest, in money or otherwise, without accountability to any person whomsoever, and limited and controlled solely by their own discretion and judgment; so that, in the language of the Court in the case of *Whelan* v. *Reilly*, & W. Va. 356—the same will and the same parties, by privity of representation—"all the interest which William, Philip, and Mary Jane could have in the residuary fund was dependent upon the contingency of the uncontrolled discretion of the trustees." No good reason is made manifest for taking out of the hands of the trustees the management of the fund while Mary Jane is in life, or for breaking in upon the general scheme of the testator, and frustrating, in whole or in part, his designs, by taking away from them the right to judge; and to control their discretion, and to compel them to give a child's part now to one who was not to take, as matter of right, any part of the inheritance in any event, or at any time, under the will. So far as distributing the fund now, in the lifetime of Mrs. Carney is concerned, the cases of *Macomb* v. *Miller*, 9 Paige 265; *Male* v. *Williams*, 48 N. J. Eq. 33 (21 Atl. 854); *In re Brown's Trust*, L. R. 16 Eq. 239; and like cases—are no answer, for here the trust is active, and for the reasons given is made to continue at least until after the death of Mrs. Carney. But if it is a case of partial intestacy, as plaintiffs claim, then they may have a present right, subject to the power of appointment vested in the trustees.

It may be proper to say in the beginning that the common-law of England, including statutes of a general nature in modification thereof, and giving writs remedial and judicial, in aid of the common-law passed prior to the fourth year of the reign of James I. (1607) continues in force within this state so far as it is not repugnant to the principles of the constitutions of the state and of the United States, and laws made in pursuance thereof, and except in those respects wherein it was altered by the general assembly of Virginia

before the 20th day of June, 1863, or has been altered by the legislature of this state (see Code [ Ed. 1891] article VIII, section 21, Constitution p. 41; and chapter 13, ss. 5, 6, p. 122) and where the common-law, by change of time and place, could have no application. The modifications made by statute bearing upon the questions here involved are contained in chapter 71 of the Code of West Virginia, in chapter 116 of the Code of Virginia of 1860; which, among other things, makes the conveyance of real estate lie in grant as well as in livery, and dispenses with the word "heirs," etc., or other words of .limitation, to pass a fee simple. Our statute of wills, found in chapter 77 of the Code of West Virginia and chapter 122 of the Code of Virginia of 1860, provides as follows: "Every person not prohibited by the following section may by will dispose of any estate to which he is entitled at his death and which if not so disposed of would devolve upon his heirs, personal representatives or next of kin." Code, W.Va., c. 77, s. 1; Code Va. (1860) c. 122. Our statute of descents and distributions is found in chapter 78, Code, W. Va., and chapter 123, Code Va. 1860. It provides that when any person having title to any real estate of inheritance shall die intestate as to such estate, it shall descend and pass in parcenary to his kindred, to the classes and in the order named. Section 9 provides that when any person shall die intestate as to his personal estate, or any part thereof, the surplus, after payment of personal expenses, charges of administration, and debts, shall be distributed to and among the same persons, and in the same proportion, to whom and in which real estate is directed to descend, with certain specified exceptions. Section 24a, chapter 71, relates to the sale and conveyance of lands and estates therein conveyed in trust, with contingent interest in favor of persons unborn. Section 14 of chapter 122 of Code Va. 1849 (Ed. 1860) p. 574, is the one which may in part bear upon this case. It differs from section 13 of chapter 77 of Code of West Virginia (Ed. 1891) p. 660. See *Frazier* v. *Frazier's Ex'rs* (1831) 2 Leigh 642. The only statute of uses which has ever been enacted in Virgina, or in this state is found in section 14 of chapter 71 of the Code of West Virginia, p.

634 (Ed. 1891) and in section 14, chapter 116, of the Code of Virginia of 1849 (Ed. 1860) p. 560. This provision has been at different times re-enacted, and as a separate section it yet remains in force. *Ocheltree* v. *McClung* (1874) 7 W. Va. 232, 238. See 1 Lomax, Dig. p. 219, side page 188. It will be noticed that it does not speak of wills. In *Bass* v. *Scott* (1830) 2 Leigh 356, it is said our statute does not execute uses created by will, we having no general statute of uses. (Cabell, J., pp. 358, 359). It is true that a court of equity may, on its own original principles, direct a trustee to convey the legal title to the *cestui que trust* whenever it may be proper that that shall be done, as in the case of a naked use; but this power is to be exercised according to a sound discretion, and the court ought to refuse to exercise it when, as in the present case, it was manifestly the intention of the testator that the management of the property should be at the discretion of the trustees, and not of the *cestui que trust.* See note of reporter, page 359. The revisers of the Code of 1849, with this case and the reporter's note before them, leave the section as it was, saying: "In the case of trusts created by will, it is so often the intention of the testator that the management of the property should be at the discretion of the trustees, and not of the *cestui que trust,* that there would be some difficulty in enacting a better rule than is laid down by the court in the case referred to." Revisers' Report, Code 1849, p. 605. The reporter who appended the note was Benjamin Watkins Leigh, who had so learnedly and laboriously prepared the revisal of 1819. See preface to Code of 1819. Section 5 of chapter 71 reads: "Any interest or claim to real estate may be disposed of by deed or will." Up to the revisal of 1849 we had an act against the sale of pretensed titles, to be found in the Code of 1819, p. 375, taken from 32 Hen. VIII., c. 9, ss. 2, 3 (1541). In th revisal of 1849 not only was omitted the old act against the sale of pretense titles, but, to make the law clear, section 5 of chapter 71 was enacted. See Report of Revisers of Code of 1849, p. 602. "The common-law idea of a partial as distinguished from an absolute, alienation of the ownership of land, opens the distinction betwen original estates and derivative estates. The

fact that several successive estates may be simultaneously derived out of one original, whereby it comes to pass that a derivative estate may be an estate not in possession, leads to the distinction between remainders and reversions. The fact that estates may be so limited as to take effect only upon the happening of a contingency suggests the distinction between vested estates and contingent estates, which last mentioned estates can only be remainders, because estates in possession and reversion are necessarily vested." Challis, Real Prop. c. 9, p. 49.

Personal property, although originally regarded, from the civil law standpoint of original absolute ownership, not partible in the common-law sense of the derivative ownership of land, has been gradually assimilated to some extent to the common-law idea of original and derivative ownership of real estate. And this drawing together is due in part to the fact that the ingenuity of conveyancers, operating upon the statute of wills and the statute of uses, and in disregard of the doctrine of abeyance of the freehold, has devised other prospective possibilities unknown to the common-law, as interests to arise at a future time, which are not estates, but which will be estates when they arise, and makes it necessary to distinguish executory interests from contingent remainders. See *Id.* And this view of giving personal property some of the qualities of real property, and real estate some of the qualities of personal property, is largely due to the creation of equitable estates by the conveyance and transfer of both kinds of the legal ownership to trustees in trust for the *cestuis que trustent*, accompanied with a power of appointment vested in the trustees, the equitable executory interests being created by executory devise, *etc.* In this way the term "vested" has come to be applied with almost the same meaning in reference to the ownership of both real and personal property, especially when applied to future limitations of equitable estates. The ownership, original or derivative, may be said to be vested when it has an abiding place, temporary or permanent, in an ascertained owner—vested in interest, when he has the fixed right of future enjoyment; also vested in possession when he has the present right of en-

joyment. It may be and is used with reference to the question of remoteness. It is also used in the sense of an ownership capable of transmission to another. See Gray. Perp. § 118; Hawk. Wills, 222, 223; Challis Real Prop. p. 56 *et seq.;* Fearne Cont.Rem. 218. But it is not in all cases the opposite of contingency. Contingent estates may be limited at common-law, and their distinguishing quality of contingency is conferred upon them by the terms of their limitation: (1) By a provision that the specified person shall not take unless the contingency shall happen; (2) that he shall not take until the happening of a future event; (3) contingent by reason that the limitation is in favor of a person not ascertained, or not yet in being.

Executory interests do not admit of being limited under the rules of the common-law. They owe their whole existence partly to the statute of wills and partly to the statute of uses. The limitations under which they arise are called "executory limitations," which in wills are executory devises, and in a deed are springing or shifting uses. In all essential characteristics these uses resemble what we now call "equitable estates," generally called "trusts." The legal estate in fee simple and absolute ownership vested in the trustee and the coterminous trust or equitable estate of the *cestui que trust* are regarded as being two separable things, presumed to be united in the holder of the legal ownership, but capable of separation, and having definite characteristics when separated. When separation takes place, the trust confers the right both to take the profits and also to call upon the trustee to make such conveyance and transfers thereof as the equitable owner shall think fit. Challis, Real Prop. p. 309. They follow the law of their creation, but in dealing with them equity generally follows the analogies of the law. Yet their history, the time when, and the chancellors under whom they originated, as well as their characteristic qualities, show that the elementary notion of them was borrowed from the Roman law. This is the accepted doctrine. See 2 Pom. Eq. Jur. § 976; 2 Story Eq. Jur. § 965; 1 Spence Eq. Jur. 439-442; 27 Am. & Eng. Enc. Law 4; Williams Real Prop. (17th Int. Ed.) c. 7, p. 192; Washb. Real

Prop. 384; Tied. Real Prop. § 438, 1 Bl. Comm. 19-80; 1 Bl. Comm. (Hammond's Ed.) Notes Ed. p. 40 *et seq.* But see 2 Pol. & M. Hist. Eng. Law, 228 *et seq.* 236; *Id.* Introduction, p. 31 *et seq.*

The chief characteristics of equitable executory interests here involved are: (1) They are with us still under the exclusive jurisdiction of courts of equity. (2) The distinction between real and personal property is reduced to a minimum. Personal property may be limited in the main, as though it were real; and real property is cut loose from the common-law prohibition of leaving the ownership of the freehold in abeyance; and of creating freehold interests to rise up and commence *in futuro,* and shift as a whole from one to another. Hence arises their great plasticity and ease with which they can be molded to meet the most complex scheme of disposing of property. Both are subject to the rule against remoteness. "They arise, when their time comes, as of their own inherent strength. They depend not for protection on any prior estates, but, on the contrary, they themselves often put an end to any prior estates which may be subsisting." Williams, Real Prop. 433.

As to the legal ownership in the trustee (1) it may be a dry, passive trust, a mere resting place for the legal title; (2) or, as in this case, it may be an active continuing trust, with the duties imposed of active management and control of the property. And a court of equity may direct a trustee to convey the legal title to the *cestui que trust* whenever by the language of the instrument, or in contemplation of the settlor, such management and control ought to come to an end. But this power of the chancellor is to be exercised according to a sound discretion; and the Court ought to refuse to exercise it when, as in the present case, it was manifestly the intention of the testator that the control and management of the property should remain with the trustees. *Bass* v. *Scott* (1830) 2 Leigh 356. Such instruments are frequently, as in this case, accompanied with a power to appoint and to sell and convey. Such uncontrolled discretion of the trustees is not to be interfered with, in the absence of bad faith (*Whelan* v. *Reilly* (1872) 5 W. Va. 356; *Gisborne* v. *Gisborne,* 2 App.

Cas. 300); and here none is charged, or in any way intimated.

The estate taken by the trustees is commensurate with the powers conferred and the purposes intended to be accomplished—in this case a fee simple absolute in fact as well as in name; no matter what period of time, if any, may be set for the ending of the trust. If, however, the trust is a dry one, or limited to await an event such as the death without issue of the beneficiary, and she has passed the age of childbearing childless, as in this case, so that, without harm to any one, we may look forward and say that for all practical purposes, the event for distribution has come, it may be made. *Male* v. *Williams*, 48 N. J. Eq. 33 (21 Atl. 854); *Macomb* v. *Miller*, 9 Paige 265; *In re Brown's Trust*, L. R. 16 Eq. 239. And it is done or refused at that time in the exercise of a sound discretion. But, however the fact of passing the age of childbearing may bear on such a practical question, it has no bearing when we come to determining the quality and quantity of estates, and ascertaining rights and interests dependent on her actual death leaving no issue. In such cases the law considers that the possibility of issue continues so long as the person lives, no matter how improbable it may be from the great age of the party; for in such cases a possibility of issue is always supposed in law to exist, unless extinguished by death. For such purpose the possibility of issue is commensurate with life. See Williams, Real Prop. 115; 2 Bl. Comm. 126; Co. Litt. 40a; Litt. Ten. § 34; *Jee* v. *Audley*, 1 Cox 324; *List* v. *Rodney* (1877) 83 Pa. St. 483, 492. And the unborn devisee of an equitable contingent executory interest in fee simple absolute, limited by a contingency determinable within the rule against remoteness, and the estate limited not contravening such rule, will, as a matter of interpretation in contemplation of law, as a probable possibility, come into existence and take. For the will, as in this case, must be read and construed as we find it—a fact fixed by the death of the testator—and is to be read not by the light of subsequent events; and, if the unborn devisee does in fact come into existence, as well as in contemplation of law, we can not hold that he will take by purchase under the will as devisee that of which the testator died intestate. Nor will the

law intend that the testator meant to die partially intestate. Gaston, J., in *Vanhook v. Vanhook*, 1 Dev. & B. Eq. 589, 596.

I have said enough to justify the decree complained of, if, instead of being as it is, a final decree of absolute dismissal on hearing of all the equities and issues presented in the pleadings, it had been a dismissal without prejudice. Being a final unqualified decree presents another question of vital importance, it may be, to the children of John Reilly; certainly to those who may hereafter claim under Mrs. Carney; and that requires us to look further into the matters of law and fact presented by this record. This latter question has led to a learned and exhaustive discussion of the nature (1) of the estate in this fund created by the settlor; (2) the characteristics of base fees, qualified fees, fees on condition, conditional fees, and fees determinable, and conditional limitations generally, and the nature and peculiar distinguishing marks of what are called "possibilities of reverter," and "possibility of reversion," and their capacity to pass by alienation and descent. For a discussion of this general subject I now refer to Gray Perp. c. 2, § 5 *et seq*, 236, where this case, when first in this Court, is cited, among others, in the note. *Whelan v. Reilly* (1869) 3 W. Va. 597, 613; Challis Real Prop. p. 197 *et seq.*; 19 Am, & Eng. Enc. Law 1035, 1055, notes; *Ocheltree v. McClung* (1874) 7 W. Va. 232; Minor. Inst. (2d Ed.) 86, 87; *Willion v. Berkley* (1652) 1 Plow. 223, 244; *Proprietors v. Grant* (1855) 3 Gray 142, 148; *Purefoy v. Rogers* (1681) 2 Saund. pt. 2, pp. 380, 381.

What is the nature of this instrument? The testator gave all his property of every kind, the real estate in fee simple, the personal estate absolutely, as a residuary fund, impressed with individuality, to trustees, with power to do all acts in relation thereto as fully as the testator could do if he were in life; nevertheless in trust to execute the directions therein given, and carry out the purposes thereby declared. It was an active, continuing trust, and required the constant control, care, and management of the trustees until the purposes of its creation had been accomplished. The testator was induced to adopt this mode of disposing of his property: (1) To avoid some of the legal questions which have been so

learnedly discussed, among others that mentioned by Blackstone (2 Bl. Comm. 173.) The common-law, if it recognized the equitable estate at all, recognized it only as in coalescence with the legal estate; and, if we keep insisting on the equitable estate being vested in the heir at law until the unborn beneficiary comes into being, we are shackling the trust with a common-law idea, which it was the very purpose of the devisor to shake off and escape. He intended that the trustees should hold in trust for the unborn devisee, and not for the heirs. Why insist on anything being vested in the heir, who can only take, if at all, in the after-contingency, so remote and improbable that the testator did not deem it necessary to provide for it at all? And as to the income in the meantime, the beneficiaries took that under the uncontrolled discretion of the trustees, and not as a matter of right. (2) To render such estate plastic, easily and safely molded to fit future contingencies, and carry out his general scheme of disposing of his property. (3) And, perhaps mainly, to provide for his children a comfortable maintenance and support during life, without subjecting his property to the hazard of being dissipated and wasted by their improvidence, and to put it in the power of the trustees to reward good conduct, and to hold out inducements for its continuance. He had unbounded faith in the fidelity of his trustees and in their practical good sense and capacity to control and manage judiciously the property in the interest and to the benefit of the objects of his bounty, who were, as to ultimate ownership, his grandchildren and their issue. His children were to take nothing except under the power of appointment. And the power given the trustees, within the purposes of the trust, "was limited and controlled only by their discretion and judgment." *Whelan* v. *Reilly* (1872) 5 W. Va. 356-357 a case in which the same will came in question between the same parties or their privies.

So far as this record shows, no one had a right to complain of being stinted, for Mrs. Carney received out and out the sum of twenty thousand dollars at one time, and, in addition, is now receiving an annuity of one thousand five hundred dollars, equal to a six *per cent.* income from a sum of twenty

five thousand dollars. But the question remains, did the testator fail to dispose of any part of his ownership, or does the will create a resulting trust in the nature of a possibility of reverter to his heirs at his death, and if so, what is the nature and effect thereof?

*First.* As to the personal part of the residuary fund, it can not be a conditional fee, changed by the statute *de donis* into a fee tail, and the latter, by our statute, converted into a fee simple; for the word employed by the statute of entails is "tenement," and mere personal chattels are not entailable (2 Minor Inst. 78 (88); and so our statute docking entails deals only with estates in land. Code W. Va. c. 71, s. 9; Code Va. 1860, c. 116. This fund, however, created by the will, is given an individuality apart from the portions of the estate which compose it—see *In re Kenyon*, 17 R.I.149 (20 Atl. 294)—and comprises the two unsold tracts of land and forty one thousand dollars odd in money, which also comprises an uncertain amount of rents and income from these lands, which amount does not now appear.

*Second.* There can be no conditional fee in the land, for no estate therein, as has already been seen, is given to the children William, Philip and Mary Jane, either expressly or by any necessary implication; and for a fee conditional there is but one condition, namely, that the grantee shall have issue or heirs of his body. 2 Minor Inst. 78 (87). The conditions admissible for the purpose of creating a conditional fee are restricted to a single type, which always takes the form of a limitation expressed to be to the heirs of the body of the donee or donees, either generally or to a special class of such heirs. The word "heirs" limits a fee or estate of inheritance, while the imposed restriction prevents the fee from being a fee simple in the proper sense of the term. Challis Real Prop. pp. 44, 209. He did not intend the issue or descendants of his grandchildren to take through his children, but required both grandchildren and their descendants to be then living, and to take directly and immediately from himself. Therefore there is no fee tail to be turned into a fee simple. This gift, is therefore, in form and effect, a fee simple absolute, determinable in the sense that it is future

and contingent, and may never vest in interest, because the donees are unborn, and may never come into existence. But this modifying quality is not expressed in the limitation fixing the quantity of ownership, but is only implied from the nature and circumstances of its origin as a gift to an unborn donee. It is not a condition subsequent which may defeat a fee simple already vested, but is rather of the nature of a condition precedent, not to the creation of the future estate, but precedent to its vesting in interest or in possession. This contingency is itself determinable within the rule against remoteness, and, so far as it bears upon the question of partial or total intestacy, it will itself, in contemplation of law, determine or end; that is the unborn donee will in all likelihood for some purposes come into existence; and in this light it must be regarded in construing the will, and not by the light of subsequent events. I need not stop to give it a name. I have given its characteristics as I now see them, and its necessary effect in preventing partial intestacy. Section 8 of chapter 71 of the Code makes this devise without any words of limitation a devise of an equitable interest in fee simple to the same extent as if the devisor had added the first sentence in Litt. Ten. (1475) "to hold to him and his heirs forever." It can not be a remainder of any kind or a reversion in any proper sense, for they are respectively but parts of one whole; the one created by the parties, and the other by operation of law. Nor do sections 12 and 13 of chapter 71 of the Code change this character of a remainder, but they only provide that it shall not fail for want of a particular estate. Therefore this equitable, executory future interest in trust, created by this executory devise, exhausts all the equitable ownership that it is capable of; is commensurate with and rounded out to the full measure of the fee simple and absolute ownership conveyed and transferred to the trustees. This seems to be comprehended in and to be inferred from the view taken of this will in *Whelan* v. *Reilly*, 5 W. Va. 356, in which this same will was then before the Court and, it seems, between the same parties or parties in interest, their privies in right or in representation. In that case the majority of the Court say (page 375): "When the language of

a testator is plain, and his meaning clear, the courts have nothing to do but to carry out the will of the testator if not inconsistent with some rule of law. By no construction of the language used in the nineteenth clause of the will can it be held that the testator intended to give to the said William, Philip or Mary Jane, or to either of them, any vested interest in the residuary fund, or in fact any interest in said fund. By the fourteenth clause there is an absolute disposition of the residuary fund in trust for the children and other descendants of the said William, Philip and Mary Jane living at the time of the death of the last survivor of the said persons. All the interest which the said William, Philip and Mary Jane could have in the residuary fund is dependent on the uncontrolled discretion of the trustees, and is therefore a contingent interest."

This brings us to what the books call a "possibility of reverter," which has been so fully and ably discussed. See 2 Minor Inst. 420; 1 Lomax Dig. (2d Ed. 1855) 603 *et seq.;* 4 Kent. Comm. p. 10 *et seq.,* 354 (381); 2 Bl. Comm. 174, 175; 1 Washb. Real Prop. (4th Ed.) p. 90; Tied. Real Prop. (2d Ed.) § 385 *et seq.;* Gray Perp. § 13; Challis Real Prop. 58, 63; 19 Am. & Eng. Enc. Law 1028, 1055, note; *Proprietors* v. *Grant,* 3 Gray 142; *Society* v. *Boland,* 155 Mass. 171 (29 N. E. Rep. 524); *Scheetz* v. *Fitzwater* (1847) 5 Pa. St. 126; *Id.,* 2 Shars. & B. Lead. Cas. Real Prop. 11, notes 17; *Ocheltree* v. *McClung* (1874) 7 W. Va. 532; *Willion* v. *Berkley* (1562) 1 Plow. 223, 244; 2 Pol. & M. Hist. Eng. Law, c. 4, § 1, pp. 21, 23. The freehold estate in right of present enjoyment, in possession, will come back by operation of law. In the case of remainder this residual ownership has also gone out of the donor; but to stay out—remain away—is not to come back, but goes to another. Possibility of reverter denotes no estate, but, as the name implies, only a possibility to have an estate at a future time. Of such possibilities there are several kinds, of which two are usually denoted by the term now under consideration. (1) The possibility that a common-law fee may return to the grantor by breach of a condition subject to which it was granted; and (2) the possibility that a common-

law fee other than a fee simple may revert to the grantor by the natural determination of the fee. Since every remainder and every reversion is a part only of the estate of the grantor or settlor, it follows that by the common-law no remainder can be limited in expectancy upon the determination of a fee, and that no reversion can remain in a grantor or settlor who parts with a fee. There can not exist two common-law fees in the same land. Co. Litt. 18a; *Willion* v. *Berkley*, 1 Plow. 223, at page 248, and authorities cited in the margin. In regard to a fee simple and a determinable fee this proposition has never been disputed. Challis Real Prop. 63. But by executory devise it has been, since the statute of wills, possible to limit a fee simple upon the determination or in defeasance of another fee simple. *Id.* It remains, therefore, in the trustees, awaiting the event fixed for vesting in the unborn beneficiaries. During that time it needs no other abiding place than with the legal fee simple absolute. Then, if no one of them is in existence, it arises in its integrity as a vested interest for those who may then be entitled as of right, for the natural inherent determinable quality of such a gift by executory devise relates to and operates upon the fund as a whole, and not upon any part of the ownership, such as a possibility of a right. Section 14, chapter 122, Code Va. 1849 (Ed. 1860) p. 574, may be thought to have some bearing, for the testator died in 1866. It reads as follows: "Unless a contrary intention shall appear by the will, such real estate or interest therein as shall be comprised in any devise in such will which shall fail or be void or otherwise be incapable of taking effect shall be included in the residuary devise (if any) contained in such will." To this the Code of West Virginia adds: "And if there be no residuary devise therein, such real estate or interest shall go to the heirs at law of the testator as if he had died intestate." Code W. Va. (Ed. 1891) c. 77, s. 13, p. 660. This addition was made by act of 9th March, 1882. See Acts 1882, p. 196, c. 84, s. 13.

The chief object of section 14 of chapter 122 of the Code of 1849 (1860) was to modify the doctrine of lapse, and substitute residuary legatees for the heirs of the testator where there is a residuary devise. Haymond, J., in *Hoke* v. *Hoke*

(1878) 12 W. Va. 427, 472. See 1 Jarm. Wills (Bigelow's 6th Ed.) c. 11, side pages 307, 309; *McGreevy* v. *McGrath*, 152 Mass. 24 (25 N. E. Rep. 29.) The statute in question (section 14, chapter 122, Code 1860) was taken from St. Vict. 1 c. 26, § 25. See 1 Jarm. Wills, side pages 321, 322. See 3 Lomax Dig. (2d Ed.) side page 114, top page 188; 2 Minor Inst., top page 1057, side page 947, as to lapse. In 1 Jarm. Wills, top page 336, it is said the doctrine of lapse is properly extended to the case of gifts on contingency. See 2 Woerner, Adm'n 911. Here the devise in question was of the residuary fund itself, and therefore this statute can have no application. This, however, leaves such possibility of the contingent resulting trust to go to his heirs at law at the testator's death, to become an executory interest vested in right of possession in such heirs as may be living, and therefore able to take in the event of the devise to the unborn donee being thenceforth incapable of taking effect by his failure to come into being on the event prescribed; and then, and not before, such interest goes to the heirs at law of the testator as if he had died intestate thereof, meaning by necessary implication, that it did not fail to take effect by reason of partial or total intestacy. For the law as it now is, see Code (Ed. 1891) p. 660, c. 77, s. 13. The heirs at the death of the testator had no present interest vested in right. There was a possibility of the happening of a future event, which, if it should occur, would then give birth to some right or interest in them. It was a present possibility of a future executory interest coming to them as a whole. Such was its character, whatever we may call it, whether it was then vested in the sense of being transmissible or for any purpose, such as having a right to look after it in a court of chancery, or to sell for a valuable consideration, subject to the doctrine of relief given to expectant heirs against unconscionable bargains is the ultimate question. It may be called a possibility of a right of reversion in the trustees, a contingent, executory resulting trust to them for those who can show themselves entitled to take in case the unborn donee is not in existence in the given event; and it comes and goes, as a whole, after the manner of executory interests, if it goes at all, for this

was their characteristic in the beginning, lying at the foundation of the whole doctrine; and it remains so to this day, giving them their great capacity of being molded to any desired form and consequent adaptability and convenience.

There is another view that might perhaps be suggested in order to give effect by necessary implication in such a will to the partly, but imperfectly, expressed intention of the testator, without running counter to the restraint imposed by the maxim, *"Voluit sed non dixit."* I give it, and must confess that it would impress me with great force if the tendency of our decisions were not strongly against applying the doctrine of implication in such cases. The scheme of this will excludes the heirs of the testator who may be living at his death in every instance in favor of his issue who may survive and be in existence when the given event happens. Such is the scheme of the fifth clause in favor of the children of John. It is to be held in trust for the then and thereafter born children equally in fee simple, and to the survivor or his issue attaining the age of twenty one. The same plan is followed in the sixth clause in favor of the children of William; in the seventh clause in favor of the children of Philip; in the eleventh clause in favor of the children, *etc.*, of Mary Jane living at her death; and when we reach the fourteenth clause—the one disposing of the residuary fund—we find it going to those descendants of William, Philip, and Mary Jane living at the death of the last survivor of these three. So that we find that each disposing clause, including the fourteenth, which disposes of the residuary fund created by the twelfth, and kept in accumulation by the thirteenth clause, follows this same general plan, which shows clearly the design that the testator's children were to take nothing except what should be given them in life under the uncontrolled discretion of the trustees, with the exercise of which the Court will not interfere in the absence of bad faith. Thus we see that throughout the will as a whole, and in each and every disposing clause, including the one in question, such general and predominant purpose stands out in plain view. Why, then, does not the necessary implication arise of a devise to his then living heirs in the event of the unborn donees not

coming into existence, and that they are to take "without re-
gard to any difference in degree of relationship or descent?"
The exclusion of William, Philip, and Mary is plainly ex-
pressed. Is not this implication necessary as a component
part of the will? See *Bartlett* v. *Patton* (1889) 33 W. Va. 72,
(10 S. E. Rep. 21); *Graham* v. *Graham* (1883) 23 W. Va. 46.
There is no such deficiency of expression as to compel the
construction of a partial intestacy, as the intention to dispose
of the whole clearly appears. See *Trust Co.* v. *Coffin* (1890)
152 Mass. 95 (25 N. E. Rep. 30) and 8 Lawy. Rep. Ann. 740,
notes. Therefore it may be said it is not a case which rests
on conjecture of what we infer the testator would have said
had he gone further and said more, but it is a case of plain in-
tention to dispose of his whole property, as shown by the cre-
ation of the residuary fund, and by his will, taken as a whole.
In contemplation of law he had a right to suppose that some
of the ultimate beneficiaries would come into existence, and,
if they did not, that those of his heirs who were then living
would take by express words, helped out by necessary impli-
cation, without embarrassing his will by alternative express
dispositions to meet such a remote contingency. If the dec-
larations of trust as to the residuary fund could be regarded
as in any degree incomplete, executory, then I have no doubt
the correct view would be for the fund to go *per capita* by pur-
chase under the will.to the heirs, *etc.*, of the testator living at
the death of the last survivior of William, Phillip, and Mary
Jane, no unborn donee having come into existence.. But, for
reasons already given, I do not regard the declaration of
trust as incomplete. Such an alternative limitation can not
be implied from a provision that the three children shall not
take, for, unless the testator meets the contingency of its
failing to take effect by giving it to some one else (*Boissieau*
v. *Aldridges*, 5 Leigh 222), it results to the heirs at law in an-
alogy to descent cast. Here the testator has given no inti-
mation, direct or indirect, that he had in mind such a con-
tingency. He has certainly not met it by an alternative exe-
cutory devise to any one else. Nor has he, in express words,
said that the heirs should in no event take, which might per-
haps have prevented a resulting trust to arise to them. See

*Attorney General* v. *Green* (1789) 2 Brown Ch. 492; 2 Crabb Real Prop. § 1794. Thus we have seen that the legal ownership and estate in fee simple absolute and in ownership absolute is expressly devised to and vested in the trustees for the clearly manifested purpose, among others, of cutting off all likelihood of partial intestacy. The corresponding equitable trust estate is also in the trustees, and the two are presumed to abide there in union until the time comes for the trust estate to spring up and vest in title or in enjoyment, as the case may be. In the meantime the trust estate is marked out, and is capable of separation, and so will have definite characteristics when the time to separate comes; and when such separation and vesting does take place, such vested ownership of the trust will confer upon the *cestui que trust* the right to the rents and profits, and also the right to call upon the trustees to convey the legal title as the equitable owner may direct, subject, however, to the doctrine laid down in *Bass* v. *Scott,* 2 Leigh 356, relating to active continuing trusts. In devolution of ownership it then follows the statute of descents and distribution. In its creation it is not complicated with the doctrine of abeyance of the freehold, or the common-law prohibition against creating freeholds to commence in the future, for neither applies to such an instrument, the fundamental idea of which is to comprehend real and personal property as near as may be in one and the same limiting words in the same disposing clause; and to cause the equitable ownership to abide its time in the trustee, and to rise up or shift as a whole when the event prescribed shall happen, provided it does not contravene the rule against remoteness. In other respects it follows the analogy of legal ownership. Here the equitable ownership of the trust fund as created and declared by the devisor is coextensive in quantity and runs parallel with the legal ownership in the trustees; but it is liable to be prevented from ever rising up and vesting in title to any right of ownership by reason of the inherent quality of being given to one designated, but not yet in existence. This quality is in the nature of a condition precedent, but technically it is not such, because it is not express, but mainly because we are in a court of equity dealing with trust prop-

erty. So far as it is an executed trust exhaustively created and declared, we take it as we find it at the death of the testator, uncontrolled and unqualified by the current of subsequent events; but, so far as the instrument is incomplete, executory, we should pursue the manifest intention of the testator to the end as near as may be. In this view, and in the event supposed, the donee not having come into existence, a resulting trust for the first time separated from the legal ownership, and for the first time vested, would spring up and vest in the then heirs, *etc.*, of the devisor.

The law of this case and of cases like it shows that the division into vested and contingent is not exhaustive. See Challis, Real Prop. p. 56    As to the origin of the use of the term, see 2 Pol. & M. Hist. Eng. Law, p. 85.    Nor is vested always the opposite of contingent or of executory, nor does the fact of vested or non-vested always determine the question of transmissibility; especially under our statute of wills and descents.    And under section 5 of chapter 71 of the Code, which reads, "Any interest in or claim to real estate may be disposed of by deed or will," that which descends may be devised, and generally that which may be devised may be sold and conveyed.    The word "vested" had originally no reference to the absence of contingency.    Hawk. Wills 221; Gray Perp. p. 62, § 99.    See *Id.* § 11, note 2.    So that it by no means follows that because an estate is contingent, therefore it is non-transmissible; for many contingent remainders and contingent executory interests are transmissible by descent, and if so, they are alienable by will and by deed.    In fact, such would seem to be the general rule under our statutes.    Contingency does not necessarily negative transmissibility.    It is in a state of contingency and doubt whether it will ever go to any one save the unborn devisee, but if it does not go there, by reason of his not coming into existence, then, by reason thereof, the interest in the fund comprised in such devise has become, by an event after the death of the testator, incapable of taking effect.    By law it then comes by descent, as a right now vested in possession, to the heirs of the testator then living.    As a possibility of a resulting trust, coupled with an interest, it had come to the heirs of the testator living at his

death. Such possibility came to an ascertained class, but one liable to open and let in others before the contingent and future event giving the right of enjoyment might happen. During this period of suspension this possibility of a resulting trust to the heirs and a contingent executory interest to the unborn devisee remains with the legal title, awaiting the prescribed event which is to determine, within the rule against remoteness, where the contingent interest will go as a fixed right of property. And during this period of doubt and suspension of vesting fixed by law as not unreasonable, and not against public policy, the equitable ownership has its true and only abiding place with the legal ownership, vested for that purpose, among others, in the trustees. And in this lies the fundamental principle and consequent simplicity, flexibility, and convenience of this mode of alienation; and the attempt to import into it and go by the irreconcilable common-law rules and principles of contingent remainders can but result in producing confusion and uncertainty.

If this view is correct, there is no partial intestacy, no such want of express language of disposition as to leave any part of the ownership of the residuary fund undisposed of, although the testator left a remote contingency which could only be met by the law of descents. This we have called the possibility of a resulting trust, and although such possibility was no part of the equitable ownership, yet depending upon the contingency of the unborn devisee not coming into being, it is said to be coupled with an interest, and therefore belonged to the heirs of the testator living at his death—might have been granted, assigned or devised by them, and under our statutes of descents and distribution would pass to their heirs or personal representatives—for a man may have a possibility of reverter where no remainder can be limited (see Gray on Perp., p. 22), and in this State (Va.) it has been thought that a right of entry was devisable under our Statute of Wills. See opinion of Green, Judge, in *Watts* v. *Cole*, 2 Leigh 653, 664 (1830.)

The decree complained of would have been right if it had said that on final hearing of the equities plaintiffs were not

then entitled to the relief prayed for, followed by a final decree of dismissal, but without prejudice. Such correction could now be made, and the decree thus corrected be affirmed. Such is the usual course. But it is likely that the trustees desire henceforth to act under the guidance and direction of the Court, and to make a settlement of their accounts; and the plaintiffs have in their pleadings laid the foundation for taking such account. It seems proper that this cause should be retained in the Circuit Court for all proper relief if the parties see fit to ask it.

The decree complained of is therefore reversed, with costs against the fund, and the cause is remanded for further proceedings.