## Staunton

TELEPHONES, INC. v. FRANK G. LaPRADE, ET AL., ETC., ET AL.

September 10, 1965.

Record No. 6009.

Present, Eggleston, C. J., and Spratley, Buchanan, Snead, I'Anson and Carrico, JJ.

*Leonard G. Muse* and *Edward L. Breeden, Jr.* (*Woods, Rogers, Muse & Walker; Breeden, Howard & MacMillan*, on brief), for the appellant.

*W. R. Broaddus, Jr.* (*William H. King; Broaddus, Epperly & Broaddus; McGuire, Woods, King, Davis & Patterson*, on brief), for Burgie Lee Fisher's Executors and Trustees, appellees.

*R. Colston Christian* (*Melvin A. Hardies; Karl Berolzheimer; Williams, Mullen & Christian; Ross, Hardies, O'Keefe, Babcock, McDugald & Parsons*, on brief), for Western Power & Gas Company, appellee.

*Holman Willis, Jr., Ben L. Kessinger, Jr., Earl M. Anderson, Herman A. Fischer*, on brief, for Asbury Theological Seminary, Moody Bible Institute and Wheaton College, appellees.

Carrico, J., delivered the opinion of the court.

In his will, Burgie Lee Fisher created the Fisher Charitable Trust, to be composed mainly of his stock in the Lee Telephone Company of Martinsville, authorizing his executors, "in their absolute discretion ...to hold and retain" the stock "as long as they may deem advisable," and then directing them, "in their sole and absolute discretion," to sell the stock and transfer the proceeds therefrom to his trustees who were empowered, when they deemed "it proper and propitious to do so," to distribute such proceeds to the religious institutions designated in the will.

This litigation, which involves the Lee Telephone stock, was commenced by the filing of a bill of complaint by Frank G. LaPrade, Garland T. LaPrade and Kennon C. Whittle, executors and trustees under the will of Burgie Lee Fisher, deceased, against Asbury Theological Seminary, Moody Bible Institute, the Trustees of Wheaton College and Telephones, Inc.

The bill sought the advice and guidance of the court as to the authority of the executors and trustees, who will be referred to as the complainants, with respect to the disposition of 168,925 shares of common stock of the Lee Company. This stock was held by the complainants in the Fisher estate. Asbury Theological Seminary, Moody Bible Institute and the Trustees of Wheaton College, which will be called the schools, were named beneficiaries of the Fisher Charitable Trust. It was alleged in the bill that the schools "may have assigned their interests in the estate" to Telephones, Inc., which will be referred to as Tel., Inc.

The bill also alleged that the complainants had entered into an agreement with Western Power and Gas Company, or Westgas as it is referred to in the briefs, providing for the sale by the complainants and the purchase by Westgas of the 168,925 shares of stock at $42.50 per share. The bill prayed that the complainants be declared to have the authority to make the sale to Westgas and that the proposed sale be approved by the court.

Tel., Inc. filed an answer and also filed a cross-bill. These pleadings alleged that the schools had transferred their interest in the Fisher Charitable Trust to Tel., Inc. and that the complainants were without authority to sell the stock to Westgas. It was prayed that the court not approve the sale to Westgas but, instead, order the complainants to deliver the stock to Tel., Inc.

Each of the schools filed an answer to the original bill admitting the transfer of its interest in the estate to Tel., Inc.

Westgas was permitted to intervene in the proceedings and it filed

an answer to the original bill and to the cross-bill of Tel., Inc. Westgas asserted the validity of its agreement to purchase the stock from the complainants and prayed for court approval of that agreement.

The cause was submitted to the court upon depositions. A decree was entered approving the sale of the stock by the complainants to Westgas and authorizing the complainants to perform the agreement providing for such sale. The cross-bill of Tel., Inc. was dismissed. This appeal followed.

At the outset of our consideration of this appeal we are confronted with an argument by Tel., Inc. that the chancellor erred in considering certain extrinsic evidence offered by the complainants and Westgas in aid of the interpretation of the will. The language of the will, Tel., Inc. contends, is clear and unambiguous and Mr. Fisher's intention is plainly disclosed thereby. Under such circumstances, Tel., Inc. asserts, extrinsic evidence is inadmissible to vary the language of the will in an effort to show a testamentary intent different from that expressed by such language.

Tel., Inc., at the commencement of the taking of depositions, made a general objection "to the introduction of any extrinsic evidence for the purpose of showing that Mr. Fisher intended to say something else." However, the closing arguments do not appear in the record, and so it is impossible to tell whether the objection of Tel., Inc. was ever brought to the attention of the chancellor. The comprehensive memorandum prepared by the chancellor does not refer to the point and the decree adjudicating the merits of the cause makes no mention of any such objection.

Furthermore, there is no error among those assigned by Tel., Inc. which would permit this court to take notice of the objection. Accordingly, while we agree with Tel., Inc. that the intention of Mr. Fisher is clearly disclosed by his will, we must state and consider all of the pertinent evidence in the record before us.

In any event, if there was any error on the part of the chancellor in considering the extrinsic evidence, it was merely harmless error. That is so because such evidence did not vary the intention disclosed by the language of the will. The evidence only gave absolute clarity to that which was already abundantly clear.

The story of the life of Burgie Lee Fisher is a fascinating saga of success. He was born and reared on a farm in Franklin County and attended school five months each year until he received all of the education available in a rural community.

After his marriage, Mr. Fisher operated a country store and it was there that he had his first contact with the telephone. A telephone company in Rocky Mount constructed a line past Fisher's place of business and he became so interested that he had a telephone installed in his store.

When the telephone was installed, Fisher inquired of the workmen as to what made the instrument work. They were unable to tell him and so, after they left, he removed the telephone from the wall and took it apart "to try to find out what made it talk." He secured a publication, "The ABC's of Telephony" and memorized it. His interest grew and with it his study and knowledge of the telephone.

The telephone company learned of his prowess and soon Fisher was repairing the telephones and lines in his community. Later, the company asked Fisher to move to Rocky Mount and take charge of the system. He and his wife took up their residence in Rocky Mount. Mrs. Fisher operated the switchboard while he maintained the lines of the system serving only 35 subscribers at the time he assumed its management.

Fisher's work greatly improved the company and its service. He began buying stock in the company and eventually became its full owner. He later acquired two other small telephone companies and in 1928 merged the three concerns into the Lee Telephone Company.

In 1930, Fisher purchased the municipally-owned Martinsville telephone system and added it to the Lee Company's holdings. The newly acquired system had 1000 telephones, or stations as they are called, but it was in very poor condition. Fisher set out to improve and expand the Martinsville facilities.

In 1932, Fisher pioneered in the telephone industry when he installed dial equipment, described as being the first such system in Virginia. In 1943, his company received international recognition when it became the first in the world to install facilities connecting all of its exchanges with its own toll lines with operator dialing, a system known as tandem dialing.

The evidence showed that the telephone company was Fisher's "pride and joy"; that he felt a keen sense of responsibility to provide his community "with the very best telephone system he could"; that he had "utmost interest" in the employees of the company, arranging just before his death to offer stock in the company to all of its employees, an arrangement carried out by his executors and trustees; that he had "implicit confidence" in Frank LaPrade and Garland LaPrade, two of those named as his executors and trustees and who

"had been with him . . . from the beginning of his telephone business."

The evidence also showed that Kennon C. Whittle had been Fisher's attorney from the time the Martinsville system was purchased until 1944; that they were "warm personal friends," and that when he requested Whittle to serve as an executor and trustee under his will, Fisher stated that if Whittle did not accept, "he would not at that time enter into this trust or make his will to the trust."

Fisher was very civic-minded and took part in numerous community affairs. He was also deeply religious, a fact well exemplified by the provisions of his will directing the creation of a charitable trust for religious institutions out of the large residuary of his estate.

The will actually provided for the creation of two trusts, one in favor of the testator's wife and the other in favor of the religious institutions. However, Mrs. Fisher predeceased her husband and, according to the terms of the will, the entire residuary of the estate then formed the corpus of the charitable trust.

Originally, there were four beneficiaries of the charitable trust, namely: Asbury Theological Seminary, with a 50 percent interest; Wheaton College, with a 16⅔ percent interest; Columbia Bible College, with a 16⅔ percent interest, and Moody Bible Institute, with a 16⅔ percent interest. However, following Fisher's death in 1955, Columbia Bible College sold and transferred its interest in the estate to Wheaton and Moody, each of which then owned a 25 percent interest in the estate.

Upon Fisher's death, the complainants, the executors and trustees under his will, undertook the management and operation of the telephone company. Frank LaPrade, who had been a director and the secretary and general manager of the company before Fisher's death, was made president. Fisher's brother was named senior vice-president and Garland LaPrade was installed as secretary-treasurer. These three, along with Kennon C. Whittle, comprised the board of directors.

At the time the complainants assumed control of the company in 1955, it had 18,000 stations. When the depositions were taken in this cause in 1962, the company had grown to include 33,350 stations. In 1955, the outstanding stock of the company was valued at $10.00 per share. Seven years later, the value of the stock, based upon the Westgas offer, had increased to $42.50 per share.

Under the administration of the complainants, the value of the principal of the Fisher estate increased from $1,691,151.47 in 1955

to $6,974,064.25 in 1962. In addition, a total of $811,706.17 was disbursed to the schools from the trust by the complainants.

The schools apparently were well content with the administration of the estate by the complainants. The Fisher will was interpreted by the complainants as meaning that the executors would control "matters relating to the sale of the stock of the Lee Telephone Company held in the estate." One of the executors testified that the position assumed by the complainants was that the schools could not "exact the sale of this stock." For almost seven years the schools acquiesced in this position.

But all of this changed in 1961, when Wheaton and Moody expressed a desire that the stock of the Lee Company be sold. Asbury was reluctant to dispose of its interest in the estate because it felt that the Lee Company "was a very fine institution." However, early in 1962, the three schools united in a decision to sell their stock interests, represented by the 168,925 shares involved in this controversy, or 72 percent of the outstanding stock of the telephone company.

On January 30, 1962, the schools entered into oral agreements with Tel., Inc. The agreements were reduced to writing and signed by Wheaton on February 2, by Asbury on February 3 and by Moody on February 5. In the agreements, the schools bound themselves to sell their beneficial stock interests in the Fisher Charitable Trust for $35.50 per share.

It was provided that Tel., Inc. would offer the complainants $35.50 per share, or approximately $6,000,000 for the 168,925 shares held by the complainants in the estate, and that ten days would be allowed for acceptance. The schools agreed to transmit the offer of Tel., Inc. to the complainants with their recommendation that the offer be accepted.

It was further provided that if the offer of Tel., Inc. was accepted by the complainants, then the agreements between Tel., Inc. and the schools would "stand cancelled and become null and void, otherwise to remain in full force and effect."

There was further provision that if the offer of Tel., Inc. was not accepted within ten days or was earlier rejected by the complainants, then the schools would assign all of their right, title and interest in the Fisher Charitable Trust to Tel., Inc., for $1,500,000 to be paid to Wheaton, $1,500,000 to Moody and $3,000,000 to Asbury. One-third of the consideration was to be paid at the time of the assignment, with a lien retained by each school on its interest until the

balance was paid upon distribution to Tel., Inc. by the complainants of the assets purchased by it.

Each of the agreements contained a provision that an identical offer was being made to each of the other schools. On the face of each agreement this was true, with the exception of the Asbury contract where it was provided that if the offer of Tel., Inc. to purchase the stock was not accepted and Asbury then assigned its interest to Tel., Inc., Asbury would be entitled to continue, until its lien was satisfied, to receive dividends on its stock interest "which may be directly attributable to two-thirds (⅔) of the total stock now held by the Trustees for the benefit of Asbury Theological Seminary."

Sub rosa of the agreements, however, and unknown to Wheaton and Moody, a letter was addressed to Asbury, dated prior to its execution of the agreement, and signed by "Telephones, Inc.–Bertel T. Malmquist, Chairman of the Board." In the letter, Malmquist agreed to "donate" to Asbury $225,000, such agreement to become effective upon delivery to Tel., Inc. of Asbury's pro rata share of the Lee Telephone Company stock.

The offer of Tel., Inc. to purchase the Lee Company stock was transmitted to the complainants, along with unexecuted copies of the agreements between Tel., Inc. and the schools.

Tel., Inc. employed William F. Stone, a prominent attorney of Martinsville, to represent it in the negotiations with the complainants. He testified that on February 3, 1962, he conferred with the complainants and advised them of the agreements between Tel., Inc. and the schools. Stone said that in the conversation Frank LaPrade stated that a better offer than $35.50 per share could be obtained for the stock. Stone testified that his reply was that a better offer would not make any difference to Tel., Inc. because any amount received for the stock over $35.50 per share would go to Tel., Inc. under its agreements with the schools, that Tel., Inc. could outbid any other prospective purchaser "since we are bidding against ourselves, we're bidding our own money."

Stone further testified that after his conference with the complainants, he secured for them executed copies of the agreements between Tel., Inc. and the schools. He said that he also received from his client the authority to offer the complainants "50¢ a share more than any other person would bid" for the stock. He stated that on February 3, he communicated this offer to the complainants and told them "We're not interested in any amount of money; we want the stock in kind and delivery of it."

In their testimony, the complainants denied that any demand had been made upon them for delivery in kind of the stock to Tel., Inc.

The complainants solicited bids from other companies and received four offers, that of Westgas of $42.50 per share, or approximately $7,180,000 in total, being the highest cash offer.

On February 8, 1962, a representative of Asbury appeared in Martinsville and conferred with the complainants. He informed them of the "side agreement" made by Malmquist to pay Asbury $225,000, contrary to the agreements with the schools that they would be treated alike.

Later in the day on February 8, the offer of Westgas to purchase the Lee Telephone stock was accepted by the complainants. The agreement entered into by the complainants and Westgas provided that "consummation of this agreement is subject to receipt by the Sellers of such authorization or order of a Court of competent jurisdiction as the Sellers properly deem necessary and adequate for their protection." The bill of complaint in the present suit was filed on February 9, 1962.

Tel., Inc., construing the acceptance by the complainants of the Westgas offer as a rejection of its offer, called upon the schools to assign their interests in the Fisher Charitable Trust. Asbury refused because its representatives felt that "we were not bound to carry out the terms thereof, to-wit, execute the assignment as contemplated."

A conference was held between Malmquist and Walter I. Deffenbaugh, attorney for Tel., Inc., and the representatives of Asbury on February 13. As a result of that conference, the "side payment" to Asbury was increased to $400,000 and the obligation for the payment thereof was assumed by Malmquist and his wife and by LeRoy T. Carlson, co-chairman of the board of Tel., Inc., and his wife. Asbury's assignment of its interest in the trust was then executed on February 13. Wheaton and Moody also executed assignments on the same date.

Herman A. Fischer, attorney for Wheaton and Moody, learned from Deffenbaugh of the "side agreement" made by Malmquist and Carlson with Asbury. Deffenbaugh told Fischer that the inequality visited upon Wheaton and Moody should be corrected and that he "would endeavor to do it."

Accordingly, new agreements were entered into in the latter part of March, 1962, in which the payment to Asbury was increased by $52,000, the payment to Wheaton was increased by $226,000 and

the payment to Moody was increased by $226,000. The obligation for such payments was assumed by Tel., Inc. The schools, in the new agreements, assigned to Tel., Inc. all right, title and interest in the Fisher Charitable Trust not covered by the assignments of February 13.

Against this factual background, we turn to the contentions made by Tel., Inc. in support of its claim that the decree of the chancellor was erroneous.

Tel., Inc. first says that it was entitled to delivery of the stock in kind and that the sale to Westgas violated its right to such delivery. Here, it relies upon a rule recognized in Virginia and throughout the country that, generally, if all the beneficiaries of a trust are sui juris and all concur in a demand for delivery in kind of the trust assets, the trustees are obligated to make such delivery and thereby terminate the trust. *Rowley* v. *American Trust Co.*, 144 Va. 375, 382-383, 132 S.E. 347; *Collins* v. *Doyle*, 119 Va. 63, 72, 89 S.E. 88; *Armistead* v. *Hartt*, 97 Va. 316, 320, 33 S.E. 616; *Thom* v. *Thom*, 95 Va. 413, 416, 28 S.E. 583; 54 Am. Jur., Trusts, § 75, p. 77.

The complainants and Westgas contend, on the other hand, that the rule just cited should not be applied so as to terminate a trust where to do so would be directly contrary to the intention of the settlor.

We agree with the position asserted by the complainants and Westgas. It is not only sound in reason but is supported, as well, by law.

Where, as here, no considerations of public policy are involved, and the trust is active, rather than passive, the rule that beneficiaries may demand delivery in kind of the res of the trust estate and thus terminate the trust, must give way to another principle of law. That principle is that where the settlor expresses a clear intention that such delivery shall not take place and that such termination may not be compelled by the beneficiaries, the courts are bound to give effect to that expressed intention. Especially is this true where, as here, the trustees are vested with broad discretionary powers and there appears no abuse of discretion in the exercise of those powers. *Rinker's Adm'r* v. *Simpson*, 159 Va. 612, 621, 166 S.E. 546; *Bass* v. *Scott*, 2 Leigh (29 Va.) 356, 359; *Commonwealth* v. *Martin's Ex'ors and Devisees*, 5 Munf. (19 Va.) 117, 122, 134; *Carney* v. *Kain*, 40 W. Va. 758, 23 S.E. 650, 655; Annotations, 123 A.L.R. 1427, at p. 1440, 163 A.L.R. 852, at p. 860.

In the will of Burgie Lee Fisher, the testator provided that if, at the

time of his death, he owned stock in the Lee Telephone Company, "then and in such event my Executors, in their sole and absolute discretion, and at such time and upon such terms and conditions as to them shall seem best, are directed to sell" the stock. The cash, bonds, and other securities received from such sale were to be delivered by the executors to the trustees and to form a part of the residuary estate making up the trust here in dispute.

The trustees were further directed to hold, manage, invest and re-invest the cash, bonds and other securities, resulting from the sale of the stock, upon the trusts set forth in the will.

The will, as originally written, directed the trustees to pay to the schools the entire corpus of the trust "within a reasonable time after receipt of the proceeds of sale from my Executors." The executors and trustees were authorized, in their "absolute discretion," when distributing the estate or the trust, to make such distribution "in kind or in money, or in part kind and in part money."

However, the executors and trustees were given "absolute discretion . . . to hold and retain all or any part of my estate or any trust created hereby, in the form in which the same may be at the time of my decease, or at the time of the receipt thereof by my Trustees from my Executors, as long as they may deem advisable."

And, in a codicil to his will, Fisher provided:

"The said trustees shall not be required to make distribution of any portion of the corpus, and any accumulated income of the Fisher Charitable Trust, by any of the Institutions . . . until they shall deem it proper and propitious to do so. It is my intent that they be given so long a time as they may deem reasonable to make sale of the properties that they feel should be sold and upon such terms and at such times as they may deem best for the protection of my estate. This provision shall apply to all of my property and particularly to my real estate and stock in the Lee Telephone Company."

The will further vested the executors and trustees with "absolute discretion" to sell any property in the estate or forming a part of the trust "for such purposes and upon such terms . . . in such manner and at such prices, as they may determine."

Finally, the will provided that no executor or trustee "shall ever be required to furnish a surety or sureties upon his official bond" and that none of the executors or trustees should be liable for any act or omission or for any loss or injury to any property "except only for his own actual fraud."

From all of this, it may be said that Fisher vested his executors

and trustees, in whom he reposed the utmost faith, with the broadest of discretionary powers and clothed them with the widest authority that testamentary language could conceive.

A reading of the will discloses a plain and obvious plan and purpose. As a part thereof, the executors and trustees were empowered to decide when and how the stock of the telephone company was to be sold. But of overriding importance, the will contained a clear and positive direction that the stock should, in all events, be sold. Any other conclusion would prevent the accomplishment of the testator's plan and purpose.

As a part of such plan, it is plain that where the will speaks of the corpus of the trust, the testator meant such corpus to be the cash, bonds, and other securities received from the sale of the telephone stock and not that stock itself. And, where the will mentions distribution in kind, Fisher obviously intended that the bonds and other securities received from the sale of the telephone stock, and not that stock itself, might be delivered in kind.

As an integral part of his plan and purpose, Fisher did not intend that the telephone stock should ever be delivered in kind to the schools. Surely he did not intend that the scheme so formulated by him, in an intricate, comprehensive seventeen-page will, could be thwarted and his wishes so easily circumvented by the mere demand, immediately upon his death, that the telephone stock be delivered in kind to the schools.

One would have to close his eyes to the obvious and turn his back upon that which is manifest to say, as Tel., Inc. suggests, that Fisher cared not what happened to the telephone company after his death. Were that true, there would have been little point in his creation of the complex design for the dissolution and distribution of his estate and in the appointment, as executors and trustees, of the two men trained by him to operate the telephone business and a third who had been his attorney, confidant and friend. His testamentary desire sought the continuation of the company as a strong, healthy monument to his creditable career. He sought to accomplish that desire by the careful language of his will, as originally written, and the selective choice of those who were to carry out his wishes.

But to make certainty more certain, Fisher added the codicil to his will. By that codicil the testator limited the right of the schools to demand delivery in kind of even those bonds or other securities included in the corpus of the trust after the sale of the telephone stock. In the codicil, he gave finality to his intention that the schools,

acting individually or in concert, were not to be permitted to dictate the actions of the executors and trustees in any way. Whatever uncertainty may have lingered, the codicil made clear that the executors and trustees had full and complete discretion and authority as to when and how the telephone stock was to be sold.

Consistent with the testamentary expressions of Fisher was the testimony of Frank LaPrade as to the reason for the safeguards placed by the testator in his will. LaPrade said:

". . . Mr. Fisher particularly didn't want the beneficiaries to participate in the management of the Lee Telephone Company. He took great pride in the fact he had trained the people that he had operating the Telephone Company. And on many occasions he told me that while the beneficiaries may know how to operate their schools, that they didn't know anything about operating a telephone company, and told me in no uncertain terms that he didn't want those beneficiaries to ever have a voice in the management of the Telephone Company, or have a part in the management of the Telephone Company."

██ Moreover, there is another reason why Tel., Inc. was not entitled to delivery of the stock in kind. There is a cardinal requirement in the rule that, in proper cases, beneficiaries of a trust may demand and receive delivery in kind of the res of the trust. That requirement is that all of those beneficially interested in the trust property must unite in the demand for such delivery and the demand must be made before sale of the property is accomplished by the trustees. That did not occur in this case.

On February 8, 1962, when the complainants sold the stock to Westgas and when the schools still held substantial beneficial interests in the estate, the schools had not made a demand for the delivery in kind of the telephone stock, nor did they ever make such a demand, even in the answers filed by them to the bill of complaint. All that the schools ever did was, as a part of their obligation under the agreements with Tel., Inc., to recommend to the complainants that the offer of Tel., Inc., to purchase the stock from the complainants be accepted. That was not a demand for delivery in kind. It was nothing more than a recognition by the schools and Tel., Inc. that the complainants had the right to accept or reject the purchase offer and of their authority to decide upon the disposition of the stock.

Before the sale was made to Westgas on February 8, Tel., Inc. was not in a position, singly, to demand delivery in kind because of the outstanding interests of the schools. On that date, the agreements between Tel., Inc. and the schools were wholly executory.

Had the complainants at that time delivered the stock to Tel., Inc. it would have been the grossest violation of their duties under the trust and of their obligations to the schools.

The assignments by the schools to Tel., Inc. of their beneficial interests in the estate were not made until February 13, five days after the sale to Westgas. The dealings of Tel., Inc. with the schools did not become complete until late March, when its manipulations with the "side agreements" were concluded. But even then, the unilateral demand of Tel., Inc. would not have been sufficient to require delivery in kind because the schools still retained a lien upon the beneficial interest in the trust for the unpaid balance of the purchase price owed by Tel., Inc.

We answer the first contention of Tel., Inc. by holding that it was not entitled to delivery in kind of the telephone stock and the sale to Westgas, therefore, did not violate its rights.

Tel., Inc. next contends that the complainants had no right to ignore its proposition to pay "$.50 a share higher than any other offer."

We cannot agree with this contention because to give sanction to such a proposition would be to cause confusion and disorder in sales by fiduciaries. If prospective purchasers in such a sale knew that someone was prepared to say to the fiduciary "I will pay $.50 more than the highest bid" and that such an offer was binding, bidding would be stifled, the sale price depressed, and an unfair advantage gained by the conditional offeror.

If such a proposition was judicially recognized, it would require fiduciaries receiving sealed bids to divulge to the conditional offeror the amount of the highest fixed bid. That is not a result to be desired in an area where fairness is the key to justice.

The anomalies of such a situation would be inexorably multiplied where two bidders both submitted to the fiduciary a bid of "$.50 a share higher than any other offer." The wisdom of a Solomon could not unravel that conundrum.

Considerations of sound public policy require us to hold that the complainants were entitled to ignore the proposition submitted by Tel., Inc. and to accept, as they did, the highest bona fide offer received for the stock.

Tel., Inc. next says that because the agreement between the complainants and Westgas was subject to court approval, the trial court was bound to decide the issue before it in the light of the facts existing at the time of the court's ruling. Although it is difficult to fathom the point of its argument, Tel., Inc. apparently takes the posi-

tion that the court should have ruled in its favor because it was entitled to delivery in kind of the stock and had, in any event, offered $.50 a share higher than any other bid.

If that be the position of Tel., Inc. it is unsound, because, as we have already ruled, Tel., Inc. has not, at any time during this controversy, been entitled to delivery in kind and its conditional offer was not a proper one.

■ Finally, Tel., Inc. devotes a considerable portion of the argument in its briefs to a suggestion that the complainants did not administer the trust "solely in the interest of the beneficiaries." It also contends that "the LaPrades were not unbiased executors." It says that "the real reason for the attempted sale to West Gas" was because the LaPrades, who owned a portion of the minority stock in the telephone company, "could get a handsome price" for their stock by accepting the Westgas offer. The gist of these contentions seems to be that the complaints used their dual role as executors and trustees and as officers and directors of the telephone company "to remain in control of the company."

Aside from the fact that the evidence is overwhelming that the complainants acted with full authority, with no abuse of their discretionary powers and in faithful performance of their trust, there is another answer in the Fisher will to these contentions of Tel., Inc.

The will provided that if any of the executors and trustees were also officers and directors of the Lee Telephone Company, "such dual capacity" should, in no way, bar them from "negotiating or dealing" with the company. It was further provided that such negotiating or dealing, or any action resulting therefrom, should not be "subject to review or concurrence of any court or questioned by any beneficiary under this will."

The will further stipulated that "none of my executors or trustees shall be prevented from purchasing from my said executors and/or trustees any stock which I may own in the Lee Telephone Company."

We find no error in the decree approving the sale of the Lee Telephone Company stock to Westgas and authorizing the complainants to perform their agreement providing for such sale. Accordingly, the decree will be affirmed.

Since the trial court, in its decree, retained jurisdiction for the purpose of permitting the complainants to request and receive the direction of the court with respect to the distribution of the proceeds of sale, the cause will be remanded for such further proceedings as may be necessary.

*Affirmed and remanded.*